# 24-1940

*To Be Argued By:*
NATHANIEL J. KRITZER

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

IN RE: APPLICATION OF

MOUSSY SALEM,

*Applicant,*

FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO
28 U.S.C. § 1782 FROM JPMORGAN CHASE BANK, N.A.

MOUSSY SALEM,

*Applicant-Appellee,*

—against—

FREDDY SALEM,

*Interested Party-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR INTERESTED PARTY-APPELLANT FREDDY SALEM

NATHANIEL J. KRITZER
JOSEPH SANDERSON
STEPTOE LLP
1114 Avenue of the Americas,
    35th Floor
New York, New York 10036
(212) 378-7604

*Attorneys for Interested Party-Appellant*

## TABLE OF CONTENTS

INTRODUCTION .................................................................. 1

JURISDICTIONAL STATEMENT ........................................ 6

STATEMENT OF THE ISSUES ........................................... 6

STATEMENT OF THE CASE ............................................... 8

    A.    The Underlying English Litigation. ......................... 8

    B.    Moussy Seeks Sweeping Discovery in England, and Is Turned Down "Based on Relevance." ....................... 9

    C.    Moussy Seeks Sweeping § 1782 Discovery *Ex Parte*, Without Disclosing the Adverse Ruling in England. ............ 15

    D.    Judge Cronan Denies Freddy's Motion to Quash. ................. 17

SUMMARY OF THE ARGUMENT ................................... 20

ARGUMENT ................................................................ 21

I.    STANDARD OF REVIEW ...................................... 21

II.    THE DISTRICT COURT SHOULD HAVE ORDERED DESTRUCTION OF EVIDENCE OBTAINED THROUGH THE IMPROPER *EX PARTE* SUBPOENA. ........................... 22

III.    SWEEPING DISCOVERY OF PROFITS, REVENUES, AND TRANSFERS FROM THE AFRICAN BUSINESS IS IRRELEVANT TO THE ENGLISH DISPUTE. ............................ 27

    A.    Moussy Needed to Show That He Could Use Discovery of the African Business's Financials in England—Which Requires They Be Relevant. .................................... 28

    B.    The District Court Wrongly Conflated the African Business's Profits with Monline International's Profits on a Cost-Plus Contract Supposedly Diverted by Monline UK. . 30

    C.    The English Court's Relevance Ruling Shows that the Revenues, Profits, and Transfers of the African Business Are Not at Issue in England. .................................... 32

i

D.   That the English Court's Pronouncements of Irrelevance
      Came in The Context of a Discovery Ruling Does Not
      Matter. ................................................................. 36

IV.   EVEN IF THE AFRICAN BUSINESS'S FINANCES WERE "FOR
      USE" IN ENGLAND, THE ENGLISH COURT'S RULING THAT
      THEY WERE IRRELEVANT WAS ENTITLED TO COMITY. .... 38

A.   *Intel* Permits A District Court to Consider Foreign Court
      Pronouncements of Minimal Relevance, Even Absent
      Offense to the Foreign Court. ................................... 40

B.   The English Court's Ruling that the African Business Was
      Not "Key" To the Issues It Had to Decide Are Entitled to
      Comity. ................................................................. 45

CONCLUSION ................................................................. 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accent Delight Int'l Ltd.*,
869 F.3d 121 (2d Cir. 2017) ..................................................... 22, 23, 29

*Application of Malev Hungarian Airlines*, 964 F.2d 97 (2d
Cir. 1992) ............................................................................................. 36

*Banca Pueyo SA v. Lone Star Fund IX (US), L.P.*,
55 F.4th 469 (5th Cir. 2022) ............................................................... 23

*In re BonSens.org*,
95 F.4th 75 (2d Cir. 2024)............................................................... 29, 37

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012) ............................................................ 36, 40

*Certain Funds, Accts. &/or Inv. Vehicles v. KPMG, L.L.P.*,
798 F.3d 113 (2d Cir. 2015) ........................................................... 28, 29

*In re DNG FZE*,
No. 23 MISC. 435 (PAE), 2024 WL 124694 (S.D.N.Y. Jan.
11, 2024) ......................................................................................... 44, 45

*In re Edelman*,
295 F.3d 171 (2d Cir. 2002) ...................................................... 22, 24, 30

*In re Escallon*,
323 F. Supp. 3d 552 (S.D.N.Y. 2018)................................................... 43

*Frasers Grp. PLC v. Stanley*,
95 F.4th 54 (2d Cir. 2024)......................................................... 40, 41, 42

*In re Gianoli Aldunate*,
3 F.3d 54 (2d Cir. 1993) .................................................................. 6, 36

*Gushlak v. Gushlak*,
    486 F. App'x 215 (2d Cir. 2012) ........................................................ 22

*IJK Palm LLC v. Anholt Servs. USA, Inc.*,
    33 F.4th 669 (2d Cir. 2022).................................................... 29, 30, 37

*In re BM Brazil 1 Fundo de Investimento em Participacoes
    Multistrategia*, No. 23 MISC. 208 (JGLC) (GS), 2024 WL
    555780 (S.D.N.Y. Jan. 18, 2024), *report and
    recommendation adopted*, 2024 WL 554302 (S.D.N.Y. Feb.
    12, 2024) .................................................................................... 43

*Intel Corp.v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) ................................................................ *passim*

*Kiobel v. Cravath, Swaine & Moore LLP*,
    895 F.3d 238 (2d Cir. 2018) .............................................................. 39

*In re Letters Rogatory from Tokyo Dist., Tokyo, Japan*,
    539 F.2d 1216 (9th Cir. 1976)............................................................ 22

*Luxshare, Ltd. v. ZF Auto. US, Inc.*,
    15 F.4th 780 (6th Cir. 2021) ................................................................ 6

*Mann v. Univ. of Cincinnati*,
    824 F. Supp. 1190 (S.D. Ohio 1993), *aff'd,* 114 F.3d 1188
    (6th Cir. 1997) (table) ...................................................................... 25

*In re Martinez*,
    No. 24-CV-20492, 2024 WL 2873137 (S.D. Fla. June 7,
    2024) .................................................................................................. 24

*Mees v. Buiter*,
    793 F.3d 291 (2d Cir. 2015) ........................................................ 28, 41

*In re Microsoft Corp.*,
    428 F. Supp. 2d 188 (S.D.N.Y. 2006), *abrogated in
    nonpertinent part by In re del Valle Ruiz*, 939 F.3d 520 (2d
    Cir. 2019) .............................................................................. 43, 44, 45

iv

*Morocho v. Stars Jewelry by A Jeweler Corp.*,
  345 F.R.D. 292 (S.D.N.Y. 2024) ........................................................ 24

*In re Rivada Networks*,
  230 F. Supp. 3d 467 (E.D. Va. 2017) ............................................... 24

*In re Salem*,
  24 Misc. 5 (JPC), 2024 WL 3026670 (S.D.N.Y. June 17,
  2024) ....................................................................................................... 8

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*,
  376 F.3d 79 (2d Cir. 2004) ............................................................... 40

*In re Tel. Media Grp. Ltd.*,
  No. 23-MC-215, 2023 WL 5770115 (S.D.N.Y. Sept. 6,
  2023) ..................................................................................................... 43

*In re Top Matrix Holdings Ltd.*,
  No. 18 MISC. 465 (ER), 2020 WL 248716 (S.D.N.Y. Jan.
  16, 2020) ............................................................................................... 42

*In re WinNet R CJSC*,
  No. 16MC484(DLC), 2017 WL 1373918 (S.D.N.Y. Apr. 13,
  2017) ..................................................................................................... 23

## Statutes

28 U.S.C. § 1291 ................................................................................. 6

28 U.S.C. § 1331 ................................................................................. 6

28 U.S.C. § 1782 ........................................................................ *passim*

## Other Authorities

Fed. R. Civ. P. 26 ........................................................................ 28, 30

Fed. R. Civ. P. 26(b)(1) ................................................................ 9, 10

Fed. R. Civ. P. 45 ........................................................................ 24, 28, 30

Fed. R. Civ. P. 45(a)(4) ............................................................... *passim*

v

Fed. R. Civ. P. 45(c)(3)................................................................22

N.Y. R. Prof. Conduct 3.3(d).....................................................23

Practice Direction 57AD § I ¶ 2.4 (Eng.) ..................................10

Practice Direction 57AD § I ¶ 6 (Eng.) ....................................10

Practice Direction 57AD § I ¶ 7.6 (Eng.) ...........................10, 33

Practice Direction 57AD § I ¶ 7 (Eng.) ....................................10

Practice Direction 57AD § I ¶ 8 (Eng.) ....................................10

## INTRODUCTION

This appeal arises from a longstanding intra-familial dispute in which Applicant-Appellee Moussy Salem[1] has repeatedly sued his uncles and other family members over the allocation of a family fortune. The underlying action was a proceeding under 28 U.S.C. § 1782 to obtain discovery in support of a foreign proceeding (the "English Proceeding"), in which Moussy (as assignee) asserts that his uncle Freddy diverted a business opportunity from a company called Monline International to a company called Monline UK. The supposedly-diverted business opportunity was a contractual right to perform a "cost-plus" contract paying costs plus 15% for providing services to dozens of companies in Africa (collectively dubbed the "African Business") that are owned by Salem family trusts. The English court overseeing the English Proceeding rejected broad discovery into the composition of the African Business, how the African Business operated, and multiple other requests regarding "the broad issues of the African Business," "based on relevance." (A-244.)

---

[1] Because many of the parties involved have the same last name, we will refer to them by first name. No disrespect is thereby intended.

Apparently dissatisfied with that ruling, Moussy brought an *ex parte* application in support of the *Monline* proceeding under 28 U.S.C. § 1782 for even broader discovery about the African Business than that the English court expressly denied as irrelevant, while failing to disclose to the District Court the prior unfavorable ruling. Moussy sought sweeping discovery from J.P. Morgan Chase Bank N.A. ("Chase") of the African Business's finances, including its revenues, profits, and funds transfers—even though the contract he says was wrongly diverted from Monline International provides for fees solely based on *expenditures* for particular services. That was *far broader* discovery than the English court rejected as irrelevant, and the 1782 petition reflected a transparent attempt to forum-shop the case into somewhere less familiar with the scope of the actual dispute.

After the application was granted *ex parte* and Freddy discovered the existence of the case through his own diligence, Freddy filed a motion to intervene and quash the subpoena that was to be issued Chase. Unbeknownst to Freddy, Moussy had already served the subpoena on Chase **with no notice to Freddy**, in violation of Fed. R. Civ. P. 45(a)(4), and had already obtained documents in response to it.

2

Freddy thus filed a revised motion seeking an order directing Moussy to destroy the improperly obtained documents.

The District Court declined to grant any such relief, effectively countenancing Moussy's rule-violating conduct, misstatements to the Court in *ex parte* proceedings, and *de facto* collateral attack on discovery rulings in the English Proceedings. Freddy thus appeals from that ruling. Freddy asks that this Court reverse and remand to the District Court, with an order directing the return and destruction of all documents received in response to the improperly obtained and issued subpoena.

In denying Freddy's motion, the District Court fundamentally misunderstood what mattered in the English proceeding, confusing *Monline UK's fee based on 15% of Monline UK's expenditures*, which Moussy says should have gone to Monline International instead and which *are* subject to discovery in England, with *the entire African Business's revenues and profits*, which are *irrelevant* to any issue in that case. Moussy's case asserts that Monline International should have earned a 15% fee based on *expenditures* (a "cost plus" structure) to provide *certain services* to the African Business, but that Freddy

3

supposedly let different companies provide those services and earn the fees instead.

The District Court's misunderstanding of the dispute derived in large part from its discounting of the English relevance ruling because it came in the context of a discovery dispute. While there is no requirement to exhaust efforts to obtain documents abroad and no requirement that a document be discoverable in the underlying foreign proceeding, Section 1782 is simply not meant to be a way to relitigate the relevance of discovery before a court with less knowledge of the underlying dispute in the hope that, as here, misleading descriptions of the foreign litigation in the *ex parte* context will let a party get discovery here that was denied as irrelevant in the foreign court. Neither the statute's text nor the principles of comity to foreign courts that underlie it warrant turning American federal district courts into courts of appeal for global discovery disputes.

The District Court similarly erred in reading the English judge's refusal to intervene in an entirely separate Section 1782 application against another uncle, Beno, as giving it *carte blanche* to ignore what the English Judge said was relevant to the proceeding before him. That

was a discussion about whether Moussy was seeking discovery for an ulterior purpose unrelated to the English litigation; this case involves the much more fundamental question of whether the discovery Moussy seeks (and illicitly received on an *ex parte* basis) was sufficiently relevant to be discoverable in the first place.

The District Court thus erred by allowing Moussy to conduct an end-run around the English relevance ruling—and doing so through improper *ex parte* subpoenas in violation of Rule 45(a)(4) that prevented Freddy from explaining the documents' irrelevance until Moussy had already illicitly obtained them. Discovery that the English court found irrelevant was, by definition, not "for use" in England. And even if it were, the District Court abused its discretion by finding that a foreign rejection on the grounds of relevance or proportionality only matters if the foreign court would be offended by allowing discovery. The District Court's belief that Section 1782 required it to engage in second guessing of relevance simply misunderstands the scope and purpose of Section 1782. Where, as here, the foreign court has made pronouncements about which subject matters are within the scope of discovery and which are not, that is entitled to comity.

5

For these reasons, this Court should reverse and remand with direction to the District Court to enter an order requiring destruction of the documents that Moussy improperly obtained.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 and § 1782. It entered its final order denying Freddy's motion to quash the subpoenas and direct the destruction or return of documents improperly produced to Moussy on an *ex parte* basis in violation of Federal Rule of Civil Procedure 45(a)(4), on June 17, 2024. (A-380-409.) Freddy timely filed a notice of appeal on July 17, 2024. (A-418.) This Court has appellate jurisdiction under 28 U.S.C. § 1291. *In re Gianoli Aldunate*, 3 F.3d 54, 57 (2d Cir. 1993) (denial of motion to vacate *ex parte* § 1782 discovery order and quash subpoena issued pursuant to it was appealable); *see also Luxshare, Ltd. v. ZF Auto. US, Inc.*, 15 F.4th 780, 782 (6th Cir. 2021) (same).

## STATEMENT OF THE ISSUES

In the English Proceeding, Moussy Salem sought broad discovery about the Salem family's "African Business." Shortly after the English court rejected those requests "based on relevance" because "the broad

6

issues of the African Business" were not "a key issue in th[o]se proceedings," Moussy applied *ex parte* to the District Court for discovery from Chase of all aspects of the African Business's finances.

The issues presented for this Court's review are:

1.      Did the District Court err in finding that evidence sought met the "for use" threshold requirement of 28 U.S.C. § 1782 where discovery of the same subject matter was denied "based on relevance" in the underlying foreign proceeding?

2.      Did the District Court err in determining that, despite the English High Court finding evidence regarding the "African Business" irrelevant, it should exercise its discretion in favor of granting discovery regarding the "African Business"?

3.      Did the District Court err in allowing Moussy to retain evidence improperly obtained through a subpoena issued without notice to the parties to the English Proceeding, in violation of Federal Rule of Civil Procedure 45(a)(4), where Section 1782 relief was obtained through misleading *ex parte* statements about the nature of the foreign proceeding?

## STATEMENT OF THE CASE

This appeal arises from an order of the United States District Court for the Southern District of New York (Cronan, J.), denying Freddy's motion to quash subpoenas that were served without notice to Freddy after Moussy applied *ex parte* for discovery in aid of the English Proceeding under 28 U.S.C. § 1782(a), and to order the return of documents Chase produced after Moussy served the subpoenas without notice to Freddy in violation of Federal Rule of Civil Procedure 45(a)(4).The decision below is unpublished but available on Westlaw at *In re Salem*, 24 Misc. 5 (JPC), 2024 WL 3026670 (S.D.N.Y. June 17, 2024).

### A.    The Underlying English Litigation.

Moussy and Freddy are members of the Salem family—the children and grandchildren of Moussa Salem and Perla Ishak Yael. (A-381.) Moussa had four children: the late Raymond, who is Moussy's father; Beno; Freddy; and Isaac. (A-381.) In the English litigation, these are known as the R, B, F, and I branches of the Salem family. (A-381.)

The English litigation is focused on a particular transaction—the supposed assignment of a contract under which one Salem family

8

company, Parker Logistics, earned service fees based on a percentage of costs incurred to provide various logistical and management services to the family treasury company, Morsgate. (A-76.) Moussy says (and Freddy denies) that this contract was assigned to a different company called Monline International with Moussy's knowledge and approval, and then to another company called Monline UK. (A-76-78.) He claims that Monline UK, which was owed by Salim Levy and Ezra Aghai, was actually effectively owned by Freddy. (A-79-80.) He is bringing claims as an assignee of Monline International's liquidators, from whom he purchased the claim, not in his own right. (A-75.)

Parker's revenue—the alleged business opportunity that Moussy claims Monline UK (and Freddy) diverted from Moussy's assignor Monline International—was a fee equal to 15% of its own costs for providing the Services. (A-295 § 34.) It thus did not depend on the financial performance of the African Business.

## B. Moussy Seeks Sweeping Discovery in England, and Is Turned Down "Based on Relevance."

Disclosure in the Business and Property Courts in England, where the English proceedings were assigned, bears a close resemblance to document discovery in the United States. Much as under Federal Rule

of Civil Procedure 26(b)(1) allows discovery of "nonprivileged matter that is relevant to any party's claim or defense," English disclosure must be "directed to the issues in proceedings." Practice Direction 57AD § I ¶ 2.4. Much as Rule 26(b)(1) requires that discovery be "proportional to the needs of the case," English disclosure must be "reasonable and proportionate." Practice Direction 57AD § I ¶ 2.4. And when a party asks for "extended disclosure," they request searches for and production of documents—favorable or unfavorable—related to particular issues specified by the parties. Practice Direction 57AD § I ¶¶ 6-7. The Practice Directions encourage the parties to limit these requests to "key issues in dispute," meaning that they should avoid "common ground" and focus on issues that "will need to be determined by the court with some reference to contemporaneous documents in order for there to be a fair resolution of the proceedings." Practice Direction 57AD § I ¶ 7.6. There are five "models" of extended disclosure; all of them require disclosure of known adverse documents, with the more intensive models requiring searches for documents (favorable or unfavorable) related to those issues. Practice Direction 57AD § I ¶ 8.

Likely as part of a plan to get information about the African Business to use for unrelated purposes, Moussy propounded discovery requests in the English litigation that sought "Model D" document disclosure (which includes searching for documents) about the following subjects:

> 9.  a)   What was the composition of the trading business in Africa associated with the Salem family (African Business) from 2013 onwards and how did it operate?
>
>     b)   What role did Morsgate play in the African Business from 2013 onwards?
>
>     c)   What role did Parker play in the African Business from 2013 until 30 March 2016?
>
>     d)   What role did [Moussy Salem], [Freddy Salem], [Salim Levy] and [Ezra Aghai] play in the African Business, Morsgate, Parker and [Monline UK] from 2013 onwards?
>
>     e)   What role did [Monline UK] play in the African Business from 7 June 2016?

(A-198-199.)

Freddy (and the other defendants) objected, principally on the basis that anything that actually placed at issue by the pleadings was already covered by other requests and that any damages would be on a "cost-plus" basis, so the Court only needed to know what the Services

11

were and how much they cost, not anything else about the African

Business. (A-230-231.[2]) On other issues, such as whether Monline UK

had provided the services previously provided by Parker to anyone else

(Topic 8(g)), the parties agreed some discovery was appropriate but

disagreed as to the appropriate method. (A-229.)

The judge overseeing discovery, Deputy Master Scher, held a

lengthy oral argument about discovery, including a careful analysis of

what matters were placed at issue by the pleadings and whether other

requests already covered them. (A-201-268.) A significant portion of

that argument focused on the relevance of the African Business, which

was the only issue by the time of argument where the question was

whether any discovery was appropriate rather than the scope of

discovery. (A-230-244.)

Ultimately, he concluded, nothing actually at issue in the English

litigation turned on the requests for discovery about the African

---

[2] The English Court reporter appears to have mistranscribed the cost-plus fee of 15% as "50%" (A-231), but the contract makes clear it is 15% (A-295 § 34.)

Business and he disallowed the disclosure request, issuing the following

ruling:

> THE DEPUTY MASTER: Okay, thank you. ***I am not
> going to direct issue 9(a) to (e) to be part of the list of
> issues for disclosure. They can all go. The reason is
> that I do not consider the broad issues of the African
> business to be a key issue in these proceedings.*** I note
> that there is evidence of a wider family dispute in which
> these documents may be relevant but ***my decision is not
> based on the allegation of collateral purpose, it is
> based on relevance***. I have looked closely at the
> pleadings; I have been taken to the relevant passages by
> counsel and I have listened to what counsel have said. It
> seems to me that the main relevance of the African
> business is the third and fourth defendants' role in it. To
> put the Parker services in context, I have considered that
> carefully and I have decided that the Parker services are
> sufficiently contextualised by issue 8(b), which is what
> services did Parker supply to Morsgate pursuant to the
> Parker Logistics agreement, and the remainder of the
> other issues in 8, including 8(g), which we kept in? Mr
> Hubbard, did we keep 8(g) in?
>
> MR HUBBARD: Yes, we did.
>
> THE DEPUTY MASTER: Yes, we did, indeed, so that is
> sufficiently covered. As for the third and fourth
> defendants' role in the Africa business, I consider that to
> be sufficiently covered by 7(a), subject to one point which
> is a broadening of the model for extended disclosure to
> model D plus narrative documents, or with narrative
> documents. That should give the claimants sufficient
> material to consider to properly understand D3 and D4's
> role in the African business. Have I got the issue wrong,
> Mr McLoughlin, you look concerned there, did I mislabel
> it?

13

MR McLOUGHLIN: I wondered whether, either before or just now, the court intended to refer to 7(a) or 7(b), both were the subject of----

THE DEPUTY MASTER: It was 7(b), was it not? Forgive me, thank you.

MR McLOUGHLIN: I only say that because I think that is the reference used earlier, but that might have been the wrong reference, not your current one.

MR AL-ATTAR: I think it is 7(b) being nomineeship and trusteeship, the narrative.

THE DEPUTY MASTER: Yes, it is 7(b), thank you for identifying that point. So no to issue 9(a) to (e), and I have given my reasons for that.

(A-243-244.[3])

This reasoning was echoed by Deputy Master Scher's comments elsewhere in the arguments; for example, when Freddy's counsel noted that "This is not a claim about the African businesses, what they do, who owns them, who is entitled to the benefit of them, or who is entitled to participate in their management," the judge agreed: "Yes." (A- 240.)

---

[3] The other discovery requests referenced in the ruling generally relate to the formation of Monline UK and related dealings (Issue 7(a)), whether Messrs. Levy and Aghai held their shares on trust for Freddy (Issue 7(b)), and whether Monline UK supplied services previously provided by Parker and, if so, on what terms (Issue 8(g). (A-197-198.)

In short, the English Court found that the sort of broad searches Moussy sought on these subjects were irrelevant; anything that did matter was already covered by other requests. The English Court's rulings on other issues, generally relating to scope of searches, were a mixed bag; for example, on Issue 8(g), it allowed "Model D" discovery (involving some searches) rather than "Model B." (A-231-232.) A different section 1782 application, by Moussy against Beno in Florida, was mentioned in the context of the defendants' argument that Moussy's document requests were for an ulterior collateral purpose but the Deputy Master viewed it as irrelevant to the questions before him. (A-240.)

### C. Moussy Seeks Sweeping § 1782 Discovery *Ex Parte*, Without Disclosing the Adverse Ruling in England.

Evidently disappointed in the Court's ruling, on January 3, 2024—about half a year after the English ruling—Moussy filed an *ex parte* application to take discovery from Chase in the Southern District of New York about any transactions involving the African Business. (A-7-133.) The requests broadly ask for all documents, statements, and transactions involving dozens of entities comprising the African

15

Business, a list of entities so long that it comprises two full pages. (A-16-17 (definition of "African Businesses"); A-24-25 (requests)).

Even though it was made *ex parte*, and thus subject to the duty to inform the Court of all material facts, favorable or unfavorable, the application studiously avoided revealing that the English court had denied broad discovery on the African Business. Rather than offering a fresh declaration from his English lawyer, Moussy refiled one that had been filed in a different Section 1782 application (against Beno). (A-69-73.) That declaration included the statement—clearly false, at least in the context of the New York application in which it was presented as an exhibit—that "Applicant has neither requested, nor been denied, the discovery sought through this Application in the English Proceedings." (A-73 ¶ 17.) It also represented that "the profits and operations of the African Business, [] in turn inform the value of the Parker Services," (A-67 ¶ 7), inconsistent with Deputy Master Scher's ruling. (A-240, 243-244.) Judge Cronan granted the application on an *ex parte* basis a few weeks later. (A-134-135.)

Then, in violation of Rule 45(a)(4)'s requirement to provide notice and a copy of the subpoena to all parties, Moussy served Chase with the

subpoena on an *ex parte* basis, without telling any of the parties to the underlying English proceeding. (A-138.) Moussy admits this; his contention before the District Court, contrary to abundant precedent, was that Section 1782 allows parties to keep subpoenas and documents produced pursuant to them secret from parties to the foreign proceedings. (A-146.) Chase produced documents before any of the English parties even knew a subpoena had been issued. (A-138.)

### D. Judge Cronan Denies Freddy's Motion to Quash.

After Freddy learned of the subpoena, he moved to quash and for an order directing Moussy to destroy the documents he had improperly obtained on an *ex parte* basis. (A-171-185.) Among other things, Freddy's English lawyer provided the materials from the English discovery dispute, including Deputy Master Scher's ruling and the Parker contract showing that the supposedly-diverted business opportunity was the chance to earn a cost-plus fee that had nothing to do with the broader African Business's profits, revenues, or transfers. (A-186-309.) Notably, contradicting Moussy's prior *ex parte* representations, his English counsel admitted in opposition that "[p]ursuant to the Morsgate Agreement, the fees generated from the

17

provision of Parker Services were calculated based on a percentage of the expenditures incurred to provide those services and support the African Businesses' operations." (A-363 ¶ 6.)

On June 17, 2024, Judge Cronan denied the motion to quash. (A380-409.) He agreed that the motion was timely despite Chase's production because Moussy had failed to give the required notice to other parties to the English proceeding that he was issuing a subpoena. (A-395-396.) Nonetheless, he held that the discovery sought was relevant to the English Litigation, accepting precisely the argument that Deputy Master Scher had rejected—that broad discovery about the African Business, including its *profits*, were relevant to determining the value of a business opportunity consisting of a fee based on *a percentage of expenses* incurred *by Monline UK*. (A-398-400.) He thus held that, despite Deputy Master Scher's ruling, Moussy could get broad discovery of transactions by or with the scores of entities that comprise the African Business, even if those transactions showed revenue or profits rather than Monline UK's expenses. (A-400-402.) The opinion incorrectly characterized the business opportunity as being related to the profits of the African Business itself, not the services Monline UK

18

provided and what it cost Monline UK to provide them. (A-398 ("[T]his information concerns the African Businesses' profits").) It thus rejected Freddy's argument that only the expenses of Monline UK mattered to the English Proceeding, not the sweeping discovery that Moussy sought of all financial transactions directly or indirectly through Chase by dozens of businesses. (A-401.) Further confusing matters, it held that the English Court granting discovery *into Monline UK's services* (Issues 8(g)-(h)) meant that it would have deemed the African Business's revenues, profits, and other transactions and transfers relevant, even though that was the Issue 9 on which the English Court denied discovery as irrelevant. (A-401.) It ruled that the English Court would not be offended by granting discovery, so the discretionary factors weighed in favor of discovery too, so the English court's limitations on discovery—even on relevance grounds—were not relevant. (A-404-406.) And while it held that Moussy had violated Rule 45(a)(4) by failing to give notice of the subpoenas, it would not quash the subpoenas based on that. (A-408-409.)

Freddy timely filed a notice of appeal. (A-418.)

## SUMMARY OF THE ARGUMENT

The District Court abused its discretion in granting the Section 1782 application and refusing to quash the subpoenas issued pursuant to it. The discovery was indisputably obtained by means of misleading statements in an *ex parte* proceeding and a surreptitiously-issued subpoena without notice to the parties. Allowing parties to benefit from such tactics invites further rule-breaking in the future, and it leaves litigants with no protection against abusive use of Section 1782 proceedings to obtain broad discovery from the many New York-located banks, whether or not their records have any relevance to any issue actually in dispute in a foreign proceeding. Consequence-free rule violations in this sensitive context would open the door to financial snooping by all manner of bad actors who purport to have some reason—valid or not—to seek financial records in aid of any foreign proceeding.

The District Court also abused its discretion by not affording comity to the express limits that the English Court placed on discoverable subject-matter. The English Court's determination "based on relevance" not to allow broad discovery into the African Business

20

should not have been subject to collateral attack in the District Court. That Section 1782 lacks a foreign discoverability or foreign exhaustion requirement does not mean that a court here can close its ears to clear statements of what actually matters in the foreign proceeding.

And even if the wide range of banking records sought met the "for use" test, the District Court abused its discretion by treating the only question as whether the English Court would be offended—as opposed to whether the application sought to relitigate questions of relevance fought and lost in England in violation of the public policy favoring finality and comity to a foreign court's determination of relevance. The non-exclusive *Intel* factors that guide a District Court's exercise of its discretion under Section 1782 are not so narrow as the District Court thought. Avoiding a "second bite at the apple" when a foreign court has ruled discovery on an issue irrelevant or disproportionate is entirely proper, and this Court should clarify that a District Court can and should consider whether a Section 1782 application would effectively allow relitigation of issues such as relevance decided by a foreign court.

## ARGUMENT

## I.   STANDARD OF REVIEW

Interpreting Section 1782 is a question of law that the Court
reviews *de novo. In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d
Cir. 2017). If the District Court correctly construed the statute, its
decision to grant or deny discovery is reviewed for abuse of discretion.
*In re Edelman*, 295 F.3d 171, 175 (2d Cir. 2002).

## II. THE DISTRICT COURT SHOULD HAVE ORDERED DESTRUCTION OF EVIDENCE OBTAINED THROUGH THE IMPROPER *EX PARTE* SUBPOENA.

The District Court's refusal to condemn Moussy's concealment of
the subpoenas from the real parties in interest and material omissions
in an *ex parte* application should be reversed.

While this Court has held that a Section 1782 application can be
made *ex parte*, it has done so only because due process is satisfied if a
party adversely affected by an order can move to quash the subpoenas.
It has held that interested parties' "due process rights are not violated
*because [they] can later challenge any discovery request by moving to
quash* pursuant to Federal Rule of Civil Procedure 45(c)(3)." *Gushlak v.
Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) (emphasis added); *accord
In re Letters Rogatory from Tokyo Dist., Tokyo, Japan*, 539 F.2d 1216,

1219 (9th Cir. 1976) (similarly noting that objections or motion to quash were why an *ex parte* application could satisfy due process).

This court has specifically emphasized the importance of "the adversarial system" in "weed[ing] out abusive Section 1782 applications." *Accent Delight*, 869 F.3d at 136. And *Intel* itself "admonished district courts to '*ensure an airing* adequate to determine what, if any, assistance is appropriate.'" *Banca Pueyo SA v. Lone Star Fund IX (US), L.P.*, 55 F.4th 469, 475 (5th Cir. 2022) (quoting *Intel Corp.v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 266 (2004)). *Ex parte* applications, moreover, are governed by a duty of full disclosure of material facts, including adverse ones, because there is no adversary to present those facts to the court. N.Y. R. Prof. Conduct 3.3(d). A violation of this duty of candor in describing "adverse rulings" in the foreign proceeding has been held sufficient grounds to deny a Section 1782 application. *In re WinNet R CJSC*, No. 16MC484(DLC), 2017 WL 1373918, at *9 (S.D.N.Y. Apr. 13, 2017).

Similarly, Federal Rule of Civil Procedure 45(a)(4) exists precisely in order to protect the due process rights of interested parties to move to quash *before* they are deprived of documents the confidentiality of

23

which they have an interest in maintaining. "The failure to give proper notice [of a subpoena] is not an insignificant matter, and it should not be lightly glossed over by a court." *Morocho v. Stars Jewelry by A Jeweler Corp.*, 345 F.R.D. 292, 293 (S.D.N.Y. 2024). The "ample protection" of Rule 45 exists in Section 1782 proceedings. *Edelman*, 295 F.3d at 178. And courts have routinely held, at least absent a court order to the contrary (such as in a sealed criminal investigation), Rule 45(a)(4) applies in the Section 1782 context and requires notice to parties to the foreign proceeding. *E.g.*, *In re Rivada Networks*, 230 F. Supp. 3d 467, 473 (E.D. Va. 2017) ("Given that the § 1782 subpoenas in this case should have been executed pursuant to Rules 27, 30, and 45, Fed. R. Civ. P., Altan Redes was entitled to notice. Specifically, Rule 45 provides that notice must be served on each party to an action before a subpoena for documents and tangible things is served on any third party."); *In re Martinez*, No. 24-CV-20492, 2024 WL 2873137, at *10 (S.D. Fla. June 7, 2024) (describing as "absurd" the argument that a foreign litigant could obtain confidential bank records without notice).

Here, Moussy unquestionably did precisely what Rule 45(a)(4) prohibits: obtaining confidential bank records without notice to

24

interested parties to allow them to intervene and object and correct the District Court's misconceptions *before* the bell was too far rung. The District Court should have considered whether this abuse of subpoenas warranted denying Section 1782 assistance altogether, and, in any event, ordering destruction or return of materials improperly obtained without notice is the appropriate remedy for covertly obtaining bank records without notice. *E.g.*, *Mann v. Univ. of Cincinnati*, 824 F. Supp. 1190, 1202 (S.D. Ohio 1993), *aff'd,* 114 F.3d 1188 (6th Cir. 1997) (table).

Moreover, there can be no question that Moussy's *ex parte* application failed to disclose a material fact: the court in the very proceeding for which he sought discovery had ruled broad discovery about the African Business (as opposed to about Monline UK's services and profits on its cost-plus contract) improper "based on relevance" (A-244). To the contrary, it presented *ex parte* a declaration that said that Moussy had not sought any information covered by the subpoena in England, even as Issue 9 covered the same ground (and in many ways was *narrower* than seeking every transaction any of the African Business entities made). (A-73 ¶ 17.) Had Moussy accurately described what he requested in England and why it was denied, then the District

25

Court may very well have decided the application differently. That is particularly true where, as here, the District Court's confusion persisted as to which entity's profits mattered to the English Proceedings; the bell of the misleading initial application could not be unrung.

Finally, the risks of the District Court's consequence-free approach to rule violation in this context warrant consideration. Because dollar-denominated transactions anywhere in the world invariably pass through New York, New York banks together house perhaps the vastest repository of financial records found anywhere in the world. Allowing use of Section 1782 to obtain such records on a pure *ex parte* basis through misleading statements about foreign proceedings would introduce severe, intolerable risks. There would be nothing to stop foreign litigants from fishing for financial records purely as a form of harassment, devoid of any real consequence. Worse yet, no meaningful protections would shield foreign parties from obtaining records for illicit purposes such as fraud, identity theft, or espionage. The courts themselves could be turned into a tool for such purposes, devoid of guardrails.

26

This was not the intent of 28 U.S.C. § 1782. The ruling below imposing no meaningful consequence for plain rule violations simply cannot stand.

## III. SWEEPING DISCOVERY OF PROFITS, REVENUES, AND TRANSFERS FROM THE AFRICAN BUSINESS IS IRRELEVANT TO THE ENGLISH DISPUTE.

Fundamentally, the District Court's decision was wrong because it the broad financial information Moussy sought about the African Business is irrelevant. The English Court had already held "based on relevance" that information about the African Business (other than the narrow question of what services Monline UK provided to them and what Monline UK was paid on its cost-plus contract for doing so) did not affect any fact at issue. (A-244.) The District Court's ruling to the contrary appears to be based on confusion between the profits *Monline International* supposedly should have earned on a cost-plus contract for providing services to the African Business (which is the supposedly-diverted business opportunity) and the profits *of the African Business itself* (which the English Court itself said was irrelevant). (A-398 ("[T]his information concerns the African Businesses' profits").)

27

Moussy had to show not just that the African Business generally provided some loose context for the Monline International-Monline UK dispute at issue in England, but rather that he had the practical ability to put the specific financial documents sought here to beneficial use there (to comply with Section 1782's statutory requirements) and that they were relevant and proportional to the issues in the English Proceeding (to comply with Rules 26 and 45 of the Federal Rules of Civil Procedure). Moussy showed neither, and the District Court abused its discretion by allowing discovery despite the lack of any such showing.

### A. Moussy Needed to Show That He Could Use Discovery of the African Business's Financials in England— Which Requires They Be Relevant.

Section 1782 requires that discovery sought be "for use" in a foreign or international proceeding. 28 U.S.C. § 1782(a). This Court has interpreted that threshold requirement as meaning that "something that will be employed with some advantage or serve some use in the proceeding." *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015). "The key question," this Court has held, "therefore, is not simply whether the information sought is relevant, but whether the [applicant] will actually be able to *use* the information in the proceeding." *Certain Funds, Accts.*

28

*&/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015). This, in turn, means "the *practical ability* of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal." *Accent Delight*, 869 F.3d at 131.

As the district courts within this Circuit have become deluged with more and more Section 1782 applications, this Court has clarified that an applicant must show with some level of detail how it can put the information it seeks to beneficial use in the foreign proceeding. For example, "[a]n applicant must [] demonstrate that the intended use of the discovery is more than merely speculative." *In re BonSens.org*, 95 F.4th 75, 80 (2d Cir. 2024). That includes showing "the procedural mechanism by which a movant may inject the discovery it seeks into foreign proceedings." *IJK Palm LLC v. Anholt Servs. USA, Inc.*, 33 F.4th 669, 680 (2d Cir. 2022). And an applicant fails to meet its burden when it "fails to demonstrate that the evidence is minimally relevant to the foreign proceeding." *In re BonSens.org*, 95 F.4th at 80; *accord Certain Funds*, 798 F.3d at 120 n.7 ("The relevance of the information sought may be necessary, however, insofar as it is difficult to conceive

29

how information that is plainly irrelevant to the foreign proceeding could be said to be 'for use' in that proceeding.").

Likewise, information must relevant and proportional to the needs of the case to be discoverable under Rules 26 and 45 of the Federal Rules of Civil Procedure (which apply in Section 1782 proceedings). *Edelman*, 295 F.3d at 178.

### B. The District Court Wrongly Conflated the African Business's Profits with Monline International's Profits on a Cost-Plus Contract Supposedly Diverted by Monline UK.

It is this relevance analysis where the District Court went off on the wrong track. To start, if the District Court believed it to be sufficient that the African Business was involved in some way with the allegations in London, that would be wrong. It is *use*—that is, the ability to put the information to some practical benefit in the litigation—that matters, and that requires some showing of what the issues in the foreign proceeding are and how the information would actually be used if it is favorable. *See IJK Palm*, 33 F.4th at 680.

The District Court's analysis confused *whose* profits matter to the English litigation. The District Court said that Moussy's contention was that "the profits earned by the African Businesses in turn inform the

30

value of the Parker Services." (A-398; *see also id.* ("[T]his information concerns the African Businesses' profits.").) But by Moussy's own admission, the value of the business opportunity supposedly diverted is "***calculated based on a percentage of the expenditures incurred***" to provide the services previously provided by Parker. (A-363 ¶ 6 (emphasis added).) In other words, the District Court confused *Monline International*'s supposed profit opportunity—that is, 15% of the *cost* of services Monline International (or Monline UK) provided *to* the African Business—with the profits of the African Business itself, which have no place in the formula in the contract that Moussy says was diverted.[4]

That admission shows that profits, revenue, or any other bank transactions involving the African Business have nothing to do with the actual issue in dispute. What matters is the *costs* incurred by Monline UK to provide these services, and those are precisely the subjects that, as the District Court noted, are already subject to discovery in the UK

---

[4] As noted above, this confusion is likely a result of Moussy's inaccurate prior, *ex parte* representation that the African Business's profits mattered. (A-67 ¶ 7.) The later admission that Monline UK's fee was purely costs-based failed to unring the bell.

and could not possibly be shown by entirely different companies' U.S. intermediary bank transfer records.

And, contrary to what the District Court seemed to think, there is no real dispute about how to value the supposedly-diverted business opportunity, because the Parker agreement that Moussy claims was the diverted business opportunity is clear as day: "The Services Fee will be 15 per cent of the expenditure set out in the Management Accounts for each Management Account Period." (A-295 § 34.) The District Court's grant of broad discovery into the financial transactions of the African Business when even Moussy says all that matters to calculate damages in England is the *expenditures* by Monline UK fundamentally fails to show relevance to an issue in dispute in England, principally because it misidentifies which entities' profits the English case is about and how they are calculated.

## C. The English Court's Relevance Ruling Shows that the Revenues, Profits, and Transfers of the African Business Are Not at Issue in England.

That failure is particularly stark because Deputy Master Scher's rulings (as well as the surrounding statements by English counsel) show that everyone in England understood that only expenditures by

32

Monline UK mattered, not profits or revenues from the African

Business. What happened when, in Issue 9, Moussy asked for discovery

about the African Business that was *narrower* than seeking all of its

financial transactions through Chase? The English court said it did not

matter "based on relevance." (A-244.) As Deputy Master Scher said, "I

do not consider the broad issues of the African business to be a key

issue in these proceedings." (A-243.) If one looks at the Practice

Direction governing disclosure in the Business & Property Courts, that

translates to the judge saying that the issues of the African Business,

while in some loose sense providing the context for why Monline UK

might have incurred expenditures from which Monline International

should supposedly have earned commissions did not "need to be

determined by the court with some reference to contemporaneous

documents in order for there to be a fair resolution of the proceedings."

Practice Direction 57AD § I ¶ 7.6. Simply put, it does not matter.

That is similarly why the District Court's reasoning that Issue 9

did not facially seek the identical financial documents that Chase has

misses the mark. (A-401.) Leaving aside whether these documents

would, in fact, be responsive to the English "Issues" (which are drafted

in a different way to U.S. discovery requests), the English Court's ruling holds that what the African Business was or was not doing does not matter to any issue in the case. Again, all that matters is what costs Monline UK incurred in providing services and what that sum multiplied by 15% is.

The District Court noted that the English Court *did* allow discovery into what services Monline UK—the entity that took over the supposedly diverted business opportunity to provide services on a cost-plus basis—provided and what they earned for it. (A-401.) But again, laboring under the same confusion about whose profits matter in the English proceeding, the District Court misunderstood the significance of that: these subjects, Issues 8(g) and (h), turn on the cost to Monline UK of providing the services alleged to have been formerly covered by the Parker contract, not the revenues, profits, or transfers of the scores of companies from which Moussy seeks discovery. (A-274.) And it is the latter, not the former, that the requests here seek.

Nor does the fact that an entirely different Section 1782 application against another uncle, Beno, in Florida was briefly mentioned during an argument about ulterior purpose undermine the

34

English Court's relevance ruling. The English Court ultimately found it unnecessary to rule on the ulterior-purpose argument *because it found Issue 9 irrelevant anyhow.* (A-243-244.) That it told the parties that the ulterior-purpose question was a matter for the Florida court thus does not detract from the irrelevance of broad financial discovery into the African Business. (A-240-241.)

Moussy does not and cannot explain how every transfer that dozens of entities have made through Chase for years would answer the question of what Monline UK spent on providing services—and it is this figure, multiplied by 0.15, that is the supposedly diverted fee that Moussy says Monline International should have earned. Nor has he explained exactly how a transfer from one entity to another entity, none of them reflecting an expenditure by Monline UK, would answer any other question in the English litigation. It is simply cover for an attempt to obtain information about the African Business for reasons that have nothing to do with the litigation Moussy cites in his moving papers.

**D. That the English Court's Pronouncements of Irrelevance Came in The Context of a Discovery Ruling Does Not Matter.**

Nor is it an answer, as the District Court thought, that this Court and the Supreme Court have rejected atextual standalone requirements for foreign discoverability,[5] admissibility,[6] or exhaustion,[7] because this Court has specifically held that courts can and should look to foreign law to determine if evidence has any practical use before the foreign court. That makes sense—relevance is an issue the foreign court knows best, and when a court says information does not matter to the issues before it, a U.S. court should take it at its word. And in common law systems where discovery procedures exist, it is no surprise that rulings about relevance often occur in the context of a discovery dispute.

---

[5] *Intel*, 542 U.S. at 262 (rejecting a "cross-the-board foreign-discoverability rule."); *Gianoli Aldunate*, 3 F.3d at 60 (finding no "threshold requirement" for foreign discoverability but noting that "district judges may well find that in appropriate cases a determination of discoverability under the laws of the foreign jurisdiction is a useful tool in their exercise of discretion.").

[6] *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 81 (2d Cir. 2012).

[7] *Application of Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992).

36

For example, in *IJK Palm*, this Court held that a party needed to show that it could actually present evidence in the foreign court, and a "district court may need to undertake a limited foray into foreign law to assess the procedural mechanism by which a movant may inject the discovery it seeks into foreign proceedings." 33 F.4th at 680. There, foreign law provided that the claim belonged to liquidators and the applicants' ability to sue depended on multiple contingencies whose likelihood they had not presented evidence of. *Id.* at 679-80. That meant they had not met their burden. *Id.* Similarly, in *BonSens.org*, this Court found it too speculative to assume that a French court that had declined to hear evidence on the merits because it lacked jurisdiction would nevertheless eventually hear merits evidence. 95 F.4th at 81.

Here, the problem is similar: while its rulings happen to have been made in the context of a discovery ruling, Deputy Master Scher's comments are powerful evidence that none of what Moussy seeks will matter at trial in England. An English judge was asked whether the details of what happened at the African Business or their profitability mattered—the English "Issue 9"—and held it did not. What mattered was the expenses on which the service fee should have been

37

calculated—the English "Issue 8(g)-(h)"—and those are not calculable from the African Business's profits, revenues, or transfers. The point is thus not that the English court denied discovery but *why* it did so: because the underlying facts, whatever they may be, do not matter to resolving any issue before it.



The District Court's confusion between Monline UK's profits on a cost-plus contract and the profits, revenues, and transfers of dozens of businesses that compromise the African Business renders its rulings on relevance clearly wrong. Its confusion led it to misunderstand the English Court's ruling, which distinguished the former (Issue 8(g)-(h)) and the latter (Issue 9) and found the latter irrelevant. Because broad sweeps of the African Business's finances have nothing to do with any issue in dispute in the English Proceeding, these requests cannot be "for use" there.

## IV. EVEN IF THE AFRICAN BUSINESS'S FINANCES WERE "FOR USE" IN ENGLAND, THE ENGLISH COURT'S RULING THAT THEY WERE IRRELEVANT WAS ENTITLED TO COMITY.

Even if the finances of the African Business just barely scraped over the threshold of relevance, the District Court misunderstood the

38

scope of its discretion under Section 1782 and erred by failing to give significant weight to the English Court's determination that the African Business was broadly irrelevant to calculating the cost-plus fee that Monline International supposedly should have earned. Section 1782 is intended as a comity-promoting statute, giving aid to foreign courts. It should not be used to collaterally attack determinations of relevance in the underlying foreign proceeding.

A district court "*may* grant discovery under § 1782 *in its discretion.*" *Kiobel v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 244 (2d Cir. 2018) (emphases added). The Supreme Court has identified certain "non-exclusive factors" that guide that discretion including (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding" over whom the "foreign tribunal has jurisdiction" and thus "can itself order them to produce evidence"; (2) the "nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other

39

policies of a foreign country or the United States"; and (4) whether the discovery is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264-65.

Since *Intel* this Court has discussed other factors that may guide a court's discretion, which include "look[ing] to the nature, attitude and procedures of that [foreign] jurisdiction as useful tools to inform its discretion." *Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*, 376 F.3d 79, 84 (2d Cir. 2004) (internal quotation marks and brackets omitted); *accord Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 81 (2d Cir. 2012). Indeed, earlier this year, this Court approved considering a *forum non conveniens* or cumulativeness of foreign discovery aspect in the analysis, in that instance associating the concept with the fourth *Intel* factor. *Frasers Grp. PLC v. Stanley*, 95 F.4th 54, 60 (2d Cir. 2024).

### A. *Intel* Permits A District Court to Consider Foreign Court Pronouncements of Minimal Relevance, Even Absent Offense to the Foreign Court.

The District Court's rejected Freddy's argument that Moussy was effectively trying to get a do-over of the English Court's ruling that the details of the African Business were irrelevant. That ruling was wrong; courts can consider foreign pronouncements of irrelevance even short of

a privilege, anti-suit injunction, or similar issue. As numerous district courts have held and *Frasers* has now confirmed, cumulativeness, dubious relevance, or forum-shopping to evade unfavorable rulings from the foreign court are absolutely proper considerations and the District Court erred as a matter of law by holding otherwise. After all, Factor 3 looks not only to circumvention of privileges but also to U.S. and foreign public policy. *See Intel*, 542 U.S. at 265 ("foreign proof-gathering restrictions *or other policies of a foreign country or the United States*" (emphasis added)). And there is a strong public policy in favor of judicial economy and deterring collateral attacks on unfavorable orders.

The District Court's holding rests on a single footnote in *Mees v. Buiter* that foreign proof-gathering restrictions "are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate*" discovery. *Mees*, 793 F.3d at 303 n.20 . (A-403.) But Freddy's argument was about public policy favoring comity and disfavoring relitigating battles fought and lost abroad, not about proof-gathering restrictions. No-one claims that England is like jurisdictions where discovery is outright blocked—to the contrary, England has a robust system of discovery not unlike our own

41

(which is why it was unsurprising that the English Court had expressed its views on relevance during a discovery hearing). Rather, the point is that it violates comity and public policy to grant a do-over to parties denied discovery on relevance-related grounds in the court most familiar with the dispute.

Contrary to the District Court's exclusive focus on whether English courts would be offended, there *is* a public policy in favor of judicial economy and against collateral attack. *Frasers*' concerns about cumulativeness of foreign discovery and the most convenient forum for discovery, while in that case categorized under Factor 4, reflect precisely this concern that the United States *actually be assisting* the foreign proceeding rather than just multiplying proceedings. *Frasers*, 95 F.4th at 60. And district courts have consistently identified being asked to second-guess foreign judges overseeing the litigation as a concern. *See, e.g.*, *In re Top Matrix Holdings Ltd.*, No. 18 MISC. 465 (ER), 2020 WL 248716, at *6 (S.D.N.Y. Jan. 16, 2020) (noting that courts "routinely reject[] Section 1782 motions under Factor Three when applicants have already exhausted available remedies in foreign tribunals and seek another 'bite at the apple' after having already been denied recourse,"

42

while ultimately finding that no such concern existed on the facts of

that case); *In re Tel. Media Grp. Ltd.*, No. 23-MC-215 (JGLC), 2023 WL

5770115, at *8 (S.D.N.Y. Sept. 6, 2023) (same); *In re Escallon*, 323 F.

Supp. 3d 552, 560 (S.D.N.Y. 2018) (finding that seeking deposition of

witnesses after they had testified in Colombia was a circumvention

attempt). Likewise, Courts have often limited discovery where a prior

request for similar discovery was made and rejected abroad,

particularly where the rejection is connected to relevance or

proportionality as opposed to a more technical concern. *See, e.g.*, *In re*

*BM Brazil 1 Fundo de Investimento em Participacoes Multistrategia*,

No. 23 MISC. 208 (JGLC) (GS), 2024 WL 555780, at *15 (S.D.N.Y. Jan.

18, 2024), *report and recommendation adopted*, 2024 WL 554302

(S.D.N.Y. Feb. 12, 2024) (pruning requests that "the English Court

barred Appian from obtaining" from Section 1782 application); *In re*

*Microsoft Corp.*, 428 F. Supp. 2d 188, 196 (S.D.N.Y. 2006) (noting that

EU Hearing Officer would determine if "the information is relevant"

and that "§ 1782 was not intended- and Microsoft cannot invoke it as a

vehicle to avoid or appeal an unfavorable discovery decision"), *abrogated*

*in nonpertinent part by In re del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019);

43

*In re DNG FZE*, No. 23 MISC. 435 (PAE), 2024 WL 124694, at *5 (S.D.N.Y. Jan. 11, 2024) (belated effort to take oral deposition in the United States after foregoing opportunity in Singapore to make showing needed for a deposition and receiving written disclosure instead was a "second bite at the apple"). Indeed, as the *Microsoft* court noted, Section 1782 is intended to *extend* comity to foreign courts by lending a hand; second-guessing foreign relevance decisions "would contravene the purpose of § 1782 by pitting this Court against the [foreign court], rather than fostering cooperation between them, and would violate established principles of comity." 428 F. Supp. 2d at 195-96.

These cases reflect a common principle: Section 1782 is intended to help foreign courts decide their cases efficiently and on the merits, not to give every disappointed foreign litigant a do-over because the foreign court had a slightly different view of what relevance or proportionality meant. Much as claim preclusion, issue preclusion, and claim-splitting doctrines reflect a public policy in favor of finality and against wasting judicial resources with duplicative litigation, that same public policy can be considered in the Section 1782 context, principally under *Intel* Factor 3. If the foreign judge finds the discovery

44

insufficiently relevant or disproportionate, the litigant should not be able to shop around for a forum less familiar with the dispute to try again.

That is why the District Court erred here: far from being a narrow factor that merely incorporates foreign privilege law, Factor 3 allows the Court to consider broader public policies. Finality is one such policy, and the District Court's error of law in interpreting Factor 3 requires reversal.

## B. The English Court's Ruling that the African Business Was Not "Key" To the Issues It Had to Decide Are Entitled to Comity.

Even if extensive discovery of the African Business's finances were sufficiently minimally relevant to be "for use" in the English proceeding, the English court's decision is entitled to respect, and it was an abuse of discretion to allow discovery on a subject that the English Court plainly found to be beyond the issues before it. The question is not, as the District Court seemed to think, whether precisely identical discovery had been sought and denied in England—both *Microsoft* and *DNG* included requests that were not a precise mirror image of the Section 1782 application, and indeed the requests in England were in some

45

ways *narrower* than producing every money transfer for dozens of entities. Rather, it is whether this Court should permit relitigation of the lines that the English Court drew, or reward Moussy for leaving requests out of his English discovery requests (because they would be viewed as irrelevant or disproportionate there) only to belatedly make them here.

Here, the English Court made clear what the key issues were. Those issues *included* what services Monline UK actually provided to, among others, the African Business and what it was paid for doing so—Issues 8(g) and 8(h)—which is information within the English court's jurisdiction, since Monline UK is headquartered in England, and Monline UK banks in the UK. (A-274.) But those issues *excluded* anything else about the African Businesses—Issue 9. (A-198-199, 243-244.) Sweeping financial discovery of the African Business and related entities is plainly on the wrong side of that line.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's order, grant the motion to quash, and direct the return of

documents improperly provided to Moussy when he served subpoenas without prior notice to Freddy contrary to Rule 45(a)(4).

Dated:  October 29, 2024        STEPTOE LLP

_/s/ Nathaniel J. Kritzer_
Nathaniel J. Kritzer
_nkritzer@steptoe.com_
Joseph M. Sanderson
_josanderson@steptoe.com_
STEPTOE LLP
1114 Avenue of the Americas
New York, New York  10036
(212) 506-3900

_Counsel for Appellant_

47

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,117 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style required of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2019 in Century Schoolbook 14-point font.

Dated:  October 29, 2024                        STEPTOE LLP

                                                          */s/ Nathaniel J. Kritzer*
                                                          Nathaniel J. Kritzer
                                                          *nkritzer@steptoe.com*
                                                          Joseph M. Sanderson
                                                          *josanderson@steptoe.com*
                                                          STEPTOE LLP
                                                          1114 Avenue of the Americas
                                                          New York, New York  10036
                                                          (212) 506-3900

                                                          *Counsel for Appellant*

# CERTIFICATE OF SERVICE

I hereby certify that I am electronically filing the foregoing with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the appellate ACMS system on October 29, 2024.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

Dated: October 29, 2024    STEPTOE LLP

*/s/ Nathaniel J. Kritzer*
Nathaniel J. Kritzer
*nkritzer@steptoe.com*
Joseph M. Sanderson
*josanderson@steptoe.com*
STEPTOE LLP
1114 Avenue of the Americas
New York, New York  10036
(212) 506-3900

*Counsel for Appellant*

# SPECIAL APPENDIX

## TABLE OF CONTENTS

PAGE

Opinion and Order of the Honorable John P. Cronan,
    dated June 17, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                          :
In re Application of                                      :
                                                          :
MOUSSY SALEM,                                             :
                                                          :
                              Applicant,                  :            24 Misc. 5 (JPC)
                                                          :
                                                          :         OPINION AND ORDER
FOR AN ORDER TO TAKE DISCOVERY PURSUANT :
TO 28 U.S.C. § 1782 FROM JPMORGAN CHASE                  :
BANK, N.A.                                                :
                                                          :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Pending before the High Court of Justice, Business & Property Courts of England and

Wales, Business List (ChD) (the "English Court") is a civil case (the "English Proceedings")

involving members of the Salem family and an alleged misappropriation of assets.  On January 3,

2024, Moussy Salem, the claimant in those proceedings, filed an *ex parte* application pursuant to

28 U.S.C. § 1782 for leave to take discovery, in the form of a subpoena *duces tecum* (the

"Subpoena"), from JPMorgan Chase Bank ("JPM") purportedly for use in that matter.  Finding

that the application satisfied the statutory requirements under Section 1782 and exercising its

discretion under the statute, this Court granted Moussy's request on January 23, 2024.  Two days

later, Moussy served the Subpoena on JPM, which produced the requested documents by February

14, 2024.  But Moussy apparently had failed to provide notice to the defendants in the English

Proceedings before he served the Subpoena on JPM.  One of those defendants, Moussy's uncle,

Freddy Salem, intervened in the instant action and now moves to quash the Subpoena and requests

a protective order requiring Moussy to destroy the documents and prohibiting him from using them

for any purpose.  For the reasons below, the Court denies Freddy's motion and request.

## I.  Factual Background[1]

### A.    The Salem Family's Management of the African Businesses

The Salem family manages trading businesses in West Africa (the "African Businesses"), whose operations entail the importation and distribution of consumer products including pharmaceuticals, tobacco products, personal care, food, alcoholic and non-alcoholic beverages, and confectionary.  8/1/2023 Goldring Decl., Exh. C (Moussy's response in the English Proceedings to certain of the defendants' requests for further information) ¶¶ 4-5.  The family is composed of four "branches" corresponding to each of Moussa Salem and Perla Ishaak Yael's children: (1) the late Raymond Salem and his family, which includes Petitioner Moussy (the "R Branch"); (2) Beno Salem and his family (the "B Branch"); (3) Freddy Salem (Intervenor in this action) and his family (the "F Branch"); and (4) Isaac Salem and his family.  *Id.* ¶ 4.  As

---

[1] In connection with his Section 1782 application, Dkt. 2 ("Application"), Moussy provided a supporting declaration from Lauren Tabaksblat, a partner and co-Chair of the Litigation and Arbitration Practice Group at Brown Rudnick, LLP, who is lead counsel for Moussy in the instant application.  Dkt. 3 ("Tabaksblat Decl.").  Annexed to Ms. Tabaksblat's declaration is, among other exhibits, an August 21, 2023 declaration from Simon Goldring, a lawyer qualified in England and Wales and a partner at Maurice Turnor Gardner LLP, who represents Moussy in the English Proceedings.  *Id.*, Exh. 1 ("8/21/2023 Goldring Decl.").  That August 21, 2023 declaration, also supplemented by various exhibits, had been submitted in connection with a separate Section 1782 action to take discovery from Beno Salem before the United States District Court for the Southern District of Florida.  *See* Tabaksblat Decl. at 2 n.1; *see also In re Salem*, No. 23 Civ. 23186 (KMM) (S.D. Fla.), Dkt. 4-1.  In moving to quash the Subpoena, Freddy provides a supporting declaration from Justin Michaelson, a solicitor admitted in England and Wales and a partner at Quinn Emanuel Urquhart & Sullivan UK LLP, who represents Freddy in the English Proceedings.  Dkt. 20 ("Michaelson Decl.").  In connection with his opposition, Moussy provides an additional supporting declaration from Mr. Goldring.  Dkt. 26 ("5/1/2024 Goldring Decl.").  The facts set forth in this section are largely drawn from these declarations and their accompanying exhibits.  These facts are provided solely for contextual purposes, however, and should not be construed as factual findings.  The Court emphasizes that the background on members of the Salem Family and their management of the African Businesses largely reflects Moussy's representations in the English Proceedings; the Court takes no position on their veracity.

beneficiaries of certain family trusts, the R, F, and B Branches own the African Businesses in equal parts. *Id.*

Historically, Morsgate International Limited ("Morsgate") served as the treasury company for the African Businesses, forming part of a corporate structure through which profits earned by certain African Businesses were transferred up to these Salem family trusts. *Id.* ¶ 3(d). Specifically, profits generated by the African Businesses were paid to and held by Morsgate, which then transferred the money to upstream companies—primarily Glynfield Finance Limited ("Glynfield") and Transglobe Logistics Limited ("Transglobe"). *Id.* These companies in turn made payments to the trusts. *Id.* Pursuant to an agreement with Morsgate, an English Company called Parker Logistics ("Parker") provided logistical and management services to the African Businesses, including distribution, banking, information technology, training, management and oversight of employees, recruitment, interfacing with supplies, shipping, transportation and forwarding, warehousing, and purchasing (the "Parker Services"). *Id.* ¶ 3(c); *see also* Michaelson Decl., Exh. D ("Morsgate-Parker Agreement") at 17 (schedule of services); Application at 8. In return, Parker received service fees calculated in part based on a percentage of the costs incurred to provide those services and support the African Businesses' operations. *See* 8/21/2023 Goldring Decl. ¶ 12; *see also* Morsgate-Parker Agreement § 33 ("The Services Fee is the annual sum Morsgate will pay to Parker, in addition to reimbursing Parker for the costs of providing the Services as provided in the agreement.").

The R, F, and B Branches of the Salem family previously had overseen the African Businesses' operation equally. 8/21/2023 Goldring Decl., Exh. C ¶ 4. But in 2013, Moussy—who had taken over the R Branch's management of the African Businesses upon his father's incapacity in 1997—was allegedly "excluded" from such management, leaving the R Branch

# SPA-4

members with only limited information on the African Businesses' operation.  *Id.* ¶ 4(d)-(g).  As further alleged, Moussy has been denied access to the email systems and physical offices used to run the African Businesses, namely those in connection with the provision of the Parker Services. 8/21/2023 Goldring Decl. ¶ 8.

In March 2016, the B and F Branches transferred management of the African Businesses, including the right to provide the Parker Services, from Parker to Monline International, Limited ("Monline International"), a British Virgin Islands corporation in which Freddy owned a fifty percent interest and Moussy and his mother beneficially owned the remaining fifty percent.  *See id.*, Exh. A ("Amended Particulars of Claim") ¶¶ 5, 16(b); Application at 8.  Shortly thereafter, Moussy agreed to a further transfer of management from Monline International to a newly-formed English company, Monline UK Limited ("Monline UK"), on the condition that the ownership structure remain the same and that Freddy and Moussy be appointed directors of the new company. 8/21/2023 Goldring Decl. ¶ 19(a)-(b).  But around June 7, 2016, Freddy transferred the assets of Monline International, including the right to provide the Parker Services, to Monline UK (the "UK Transfer")—allegedly without Moussy's knowledge and for no or insufficient consideration.  *Id.* ¶¶ 18-19.  At that point, Monline UK, in which neither Moussy nor his mother in fact had any ownership interest, became the sole provider of the Parker Services.  *Id.*; *see* Application at 2, 8-9.

## B.    The English Proceedings

On October 12, 2020, a British Virgin Islands court ordered Monline International to be wound up.  Amended Particulars of Claim ¶ 3.  Having investigated Monline International's affairs, the court-appointed liquidators determined it was necessary to initiate a separate action in the United Kingdom against Freddy, Monline UK, and Monline UK's sole directors and

shareholders, Salim Levy and Ezra Aghai (together, the "English Defendants").[2]  Application at
9; *see also* Amended Particulars of Claim ¶ 3.

Accordingly, on October 4, 2022, proceedings commenced before the English Court, which
assigned the prosecution of the case to Moussy, pursuant to a deed of assignment between Monline
International and Moussy.  *See* 8/21/2023 Goldring Decl. ¶ 4; Amended Particulars of Claim ¶ 1.
Almost a month later, on November 2, 2022, Moussy submitted the Amended Particulars of Claim,
in which he alleges that: (1) Freddy breached his duty to Monline International for causing and/or
permitting the UK Transfer; (2) the UK Transfer was a gratuitous transfer; and (3) through the UK
Transfer, Freddy and Monline UK conspired to divest Monline International of its assets to place
those assets out of Moussy's reach.  Amended Particulars of Claim ¶¶ 25-36.  Moussy seeks,
among other forms of relief, equitable compensation for the business Monline International lost as
a result of the UK Transfer.  *Id.* ¶ 37.

On July 11, 2023, Moussy learned (through certain of the English Defendants' admissions
in the English Proceedings) that in or around July 2017 a newly-formed Lebanese company called
Gestcom Trading ("Gestcom"), one of the African Businesses, replaced Morsgate as the recipient
of the Parker Services.  8/21/2023 Goldring Decl. ¶¶ 10-11.  Moussy also learned that in or around
March 2021, Monline UK stopped providing the Parker Services.  *Id.* ¶ 11.

On July 19, 2023, the English Court held a hearing to set the issues for disclosure (*i.e.*,
discovery).  5/1/2024 Goldring Decl. ¶ 7; Michaelson Decl. ¶ 7; *see also* Michaelson Decl., Exh.
B ("7/19/2023 English Ct. Hr'g Tr.").  Under relevant rules in the English Court, these issues are
agreed upon by the parties or determined by the English Court and must arise from the pleaded

---

[2] Salim Levy died during the course of the English Proceedings; the executor of Salim
Levy's estate, Ighal Levy, is now the fourth defendant.  *See* 5/1/2024 Goldring Decl. ¶ 1.

# SPA-6

cases of the parties. Michaelson Decl. ¶ 5. In advance of the hearing, the parties in the English

Proceedings submitted a draft including their proposed issues for disclosures and indicated any

areas of disagreement in that submission. *Id.* ¶ 7; *see* Michaelson Decl., Exh. A ("Proposed

Issues").

The English Court's determinations concerning two proposed issues of disclosures—*i.e.*,

Proposed Issues 8 and 9—bear on the instant dispute. The disclosure requests under Proposed

Issue 8, captioned "Morsgate," included:

> a.) What role (if any) did [Freddy or Aghai] play in the management or affairs of
> Morsgate from 2013 onwards?
> b.) What services did Parker supply to Morsgate pursuant to the 'Parker Logistics
> Agreement' dated 14 March 2000 from 2013 until 30 March 2016?
> c.) What services were provided to Morsgate by [Monline International] after 30
> March 2016?
> d.) What payments were made to or for the benefit of [Monline UK] by Morsgate
> from 7 June 2016 to date and on what basis?
> e.) What became of those payments?
> f.) Did [Monline UK] cease to supply Parker Services to Morsgate after 1 August
> 2016 and if so when and in what circumstances?
> g.) Has [Monline UK] supplied Parker Services or other services to persons other
> than Morsgate and if so when, on what terms and in what circumstances?
> h.) What payments has [Monline UK] received since 7 June 2016 from persons
> other than Morsgate and what has become of them?

Proposed Issues at 5-7. For Proposed Requests 8(b) through 8(h), the parties proposed Model D[3]

as the method of disclosure, *id.*, except that Freddy requested the removal of Request 8(g) and the

removal of "persons other than" in Request 8(h), *id.* at 6 n.11, 12.

In advocating for the retention of Request 8(g), Moussy's counsel explained that the issue

concerning Monline UK's supplying the Parker Services to entities other than Morsgate arose in

---

[3] "Model D" refers to a "specific type of disclosure under which the parties must agree [to]
the scope of parameters for a search of documents (key words, custodians and date ranges) and the
party ordered to search must then disclose documents directly relevant to that issue and adverse to
its case." *See* Michaelson Decl. ¶ 10.

connection with Monline UK's and Aghai's admissions that sometime in 2017, Monline UK had stopped providing the Parker Services to Morsgate and started providing them to Gestcom. 7/19/2023 English Ct. Hr'g Tr. at 22. He urged that, as a result, "the question of the provision of services and trading with parties other than Morsgate is part of our pleaded case in the amended particulars of claim in that it arises from our claims for relief and to trace assets and for accounts of profits." *Id.* The English Court readily accepted the relevance of that information as to quantum (*i.e.*, the amount of damages), but not as to liability:

> I can see very clearly how the size and scope of the business opportunity which you say has been transferred away from [Monline International] and then [Moussy], and therefore [Moussy]'s cause of action. I can see how the extent of that business opportunity—to assess the extent of that business opportunity, an analysis would need to be made about what Parker services were being supplied and to whom. I can see how that is relevant to, to put it broadly, quantum.
>
> I am less clear as to how it is relevant to liability.

*Id.* at 23. Moussy's counsel thus elaborated that the Proposed Issue 8(g) information

> would be relevant to what [Moussy] say[s] about who owns [Monline UK], and hence what was going on when there was the UK transfer in 2016. Obviously, if one sees a pattern of [Monline UK] being used at the direction of [Freddy] to do various things in the African business, well that does support [Moussy's] case that [Freddy] is the beneficial owner of [Monline UK], and always has been.

*Id.* at 24. While it recognized the broad relevance of the information, the English Court further pressed Moussy's counsel to demonstrate the connection between that request and the content of the pleadings. *Id.* ("[English Court]: I can see the relevance to your case generally. Where is it pleaded?"). Moussy's counsel responded that the request pertained to Moussy's "central" allegation that the UK Transfer involved the transfer of a "valuable business," insofar as Freddy had taken the position that the 2016 agreement between Monline UK and Morsgate (concerning the right to supply the Parker Services) was "less advantageous" than the earlier agreement

between Parker and Morsgate, and that Monline UK, as a result, "earned a small revenue and made modest profits." *Id.* at 25. The English Court appeared to agree:

| | |
|---|---|
| [English Court]: | You have required them to prove . . . |
| [Moussy's Counsel]: | Yes. |
| [English Court]: | . . . benefits that [Defendants] have received from the supply of Parker services under the 2016 agreement or otherwise . . . |
| [Moussy's Counsel]: | Yes. |
| [English Court]: | . . . to other companies within the African business . . . |
| [Moussy's Counsel]: | Yes. |
| [English Court]: | . . . or from other trading activities of [Monline UK]? |
| [Moussy's Counsel]: | Yes. |
| [English Court]: | You have required them to prove what they have said in their defence, which is that it is a small fry. |
| [Moussy's Counsel]: | Yes. |
| [English Court]: | Let us go back to the list of issues for disclosure. Bearing in mind that you have required them to prove the source of income for the business that they did. I can see how [8](h) directly reflects your requirement for proof of that point. |
| [Moussy's Counsel]: | Yes, and [8](g) is really the companion piece to that, because (g) is directed to identifying who the trading partners were, and [8](h) is directed to identifying what the results were, so we would say those are squarely issues which are on the pleadings . . . |
| [English Court]: | Yes. |

*Id.* at 25-26. As such, the English Court approved the inclusion of Request 8(g) over Freddy's objection, which entailed disagreement not on the relevance of the information but rather the specific method of disclosure proposed. *Id.* at 26 ("[Freddy's counsel]: Sir, if I may, I think the disagreement between the parties on issue 8 is not so much as to 8(g) and (h) is as to the disclosure

8

model, as to whether one requires a search as opposed to model (b). I think that is the difference between the parties."), 28-29; *see also* Michaelson Decl., Exh. C (the English Court's "Disclosure Review Document") at 4 (reflecting inclusion of all requests under Proposed Issue 8).

Next, Proposed Issue 9, captioned "African Business" included the following requests:

a) What was the composition of the trading business in Africa associated with the Salem family (African Business) from 2013 onwards and how did it operate[]?
b) What role did Morsgate play in the African Business from 2013 onwards?
c) What role did Parker play in the African Business from 2013 until 30 March 2016?
d) What role did [Moussy, Freddy, Levy, and Aghai] play in the African Business, Morsgate, Parker and [Monline UK] from 2013 onwards?
e) What role did [Monline UK] play in the African Business from 7 June 2016?

Proposed Issues at 7-8. Freddy further requested the exclusion of all of Issue 9. *Id.* at 7 n.13.

Moussy's counsel maintained that these requested disclosures—characterized by the English Court broadly as concerning "the composition of the African Business from 2013 onwards and how it operated," 7/19/2023 English Ct. Hr'g Tr. at 31—pertained to "the relationship between [Freddy, Levy, and Aghai]," the determination of who really owns Monline UK, and the inquiry into each Defendant's role in effectuating the UK Transfer, particularly given Moussy's position that "there was a live relationship between [Aghai] and Morsgate and [Freddy] and Morsgate." *Id.* at 29. While the English Court seemed to appreciate Moussy's use for such information, it nonetheless decided to excise the entirety of Proposed Issue 9, considering its sheer breadth as written as well as its overlap in scope with other approved disclosure issues:

I am not going to direct issue 9(a) to (e) to be part of the list of issues for disclosure. They can all go. The reason is that I do not consider the broad issues of the African business to be a key issue in these proceedings. . . . It seems to me that the main relevance of the African business is [Levy's and Aghai's] role in it. To put the Parker services in context, I have considered that carefully and I have decided that the Parker services are sufficiently contextualised by issue 8(b), which is what services did Parker supply to Morsgate pursuant to the Parker Logistics agreement, and the remainder of the other issues in 8, including 8(g), which we kept in[.]

\* \* \*

> As for [Levy's and Aghai's] role in the Africa[n] business, I consider that to be sufficiently covered by 7(a),[4] subject to one point which is a broadening of the model for extended disclosure to model D plus narrative documents, or with narrative documents.[5]  That should give the claimants sufficient material to consider to properly understand [Levy's and Aghai]'s role in the African business.

*Id.* at 40-41; *see also id.* at 32 ("[English Court]: *I agree you need to understand what the African business [was]*, but that is not the test for whether you get model D disclosure on it, or any disclosure on it.  [I] can see how on that pleading you might be entitled to documents relating to [Levy and Aghai]'s function in the African business, and their relationship with [Freddy], I can see how that might be—I can see how you might get that from your 9(d) and (e) . . . ." (emphasis added)), 39 ("[English Court]: It seems to me that the best way to address [Levy and Aghai]'s involvement in the African businesses is by looking at 7(b) again and considering whether that is sufficient to throw up documents surrounding their involvement in the African business which would provide what might be similar fact evidence about nomineeship here, or indeed sort of low level employee type evidence.").

During the discussion with the English Court on Proposed Issue 9, Freddy's counsel briefly referenced Moussy's Section 1782 petition in the Southern District of Florida to take discovery from Beno Salem.  *Id.* at 37; *see also supra* n.1 (referring to that Section 1782 action).  The English Court responded, "I have not looked at the US thing, I do not find it that helpful.  I recognize your allegation that the claimant is looking for information about the African business.  All I need to

---

[4] It appears that the English Court, intending to refer to Request 7(b), mistakenly referred to Request 7(a) here.  *See* 7/19/23 English Ct. Hr'g Tr. at 41.  Request 7(b) reads: "Do [Levy and Aghai] hold their shares in [Monline UK] on trust for or as nominees for [Freddy]?"  Proposed Issues at 5.

[5] Such narrative documents consist of "documents relevant to the background or context of material facts and events regarding [an] issue."  Michaelson Decl. ¶ 10.

10

## SPA-11

decide is whether it is a key issue in this case or not."  7/19/2023 English Ct. Hr'g Tr. at 37; *see also id*. at 38 ("[English Court]: You can take that up with the American courts if you want.").

At the conclusion of the July 19, 2023 hearing, the English Court scheduled the next hearing for September 20, 2024.  *Id.* at 63.

### II.  Procedural History

On January 3, 2024, Moussy filed an *ex parte* application pursuant to 28 U.S.C. § 1782 for leave to take discovery from JPM, the U.S. intermediary bank for payments made by Morsgate to Transglobe and Glynfield, purportedly for use in the English Proceedings.  Dkts. 1-3.  Specifically, Moussy sought documents concerning payments to and from Morsgate, Monline UK, Gestcom, Transglobe, Glynfield, and any of the African Businesses, as well as statements for any accounts held by these entities and documents showing the identities of any individuals or entities that maintained control over or instructed the payment of such monies through Morsgate, Monline UK, and Gestcom.  *See* Dkt. 1-1 ("Subpoena") at 11-12 (listing ten document requests).

In his application, Moussy maintained that this information could help determine the value of the Parker Services and thereby aid "the English [C]ourt in understanding the full chain of events surrounding the provision of Parker Services, the adequacy of the consideration paid for the transfer from Monline International to Monline UK, and the extent of Moussy's damages." Application at 14.  Moussy further represented:

> [T]he English court has not denied similar discovery; indeed, the scope of the discovery sought aligns with the topics of party disclosure already permitted by the English court, including with respect to Morsgate's, Gestcom Trading's, and other unknown third parties' receipt of Parker Services; the amounts paid for those services; and whether those services are provided today.

*Id.* at 18; *see also id.* at 13 ("An order for disclosure has been given in [the English] proceedings, and the information sought from JPM is consistent with the information that the [English]

Defendants are required to disclose.").  Lastly, as to any potential burden on JPM, Moussy

explained that the discovery sought "should be readily available to JPM and relatively simple to

collect and produce," adding that he was willing to "engage in a good faith effort to meet and

confer over the parameters of [JPM]'s search to minimize any legitimate concerns." *Id.* at 19.

On January 23, 2024, this Court found that the application met the statutory requirements

under 28 U.S.C. § 1782 and, having considered the relevant discretionary factors, granted the

application.  Dkt. 8.  Two days later, Moussy served the Subpoena on JPM, but did not provide

notice to the English Defendants before doing so.  *See* Dkts. 10, 11.  The Subpoena contained the

following document requests:

> 1. All documents concerning actual or attempted payments and/or the transfer of
> monies to/from Morsgate, including but not limited to monies to/from the account
> at Bank J. Safra Sarasin Ltd. in the name of Morsgate bearing account no. 601786
> as  shown  in  swift  transaction  reference  nos.  11005865700007P,
> 11005865670007P,      11005865780007P,      11005868570007P,      and
> 11005868630007P, including but not limited to monies that [JPM] received and/or
> sent as an intermediary bank.
>
> 2. All documents concerning actual or attempted payments and/or the transfer of
> monies to/from Monline UK, including but not limited to monies to/from the
> account at Bank J. Safra Sarasin Ltd. in the name of Monline UK bearing account
> no. 606075, including but not limited to monies that [JPM] received and/or sent as
> an intermediary bank.
>
> 3. All documents concerning actual or attempted payments and/or the transfer of
> monies to/from Gestcom Trading, including but not limited to monies that [JPM]
> received and/or sent as an intermediary bank.
>
> 4. All documents concerning actual or attempted payments and/or the transfer of
> monies to/from Transglobe, including but not limited to monies to/from the account
> at Rothschild Bank International Ltd[.] in the name of Transglobe as shown in swift
> transaction    reference    nos.    11005865700007P,    11005865670007P,
> 11005865780007P, and 11005868630007P, including but not limited to monies
> that [JPM] received and/or sent as an intermediary bank.
>
> 5. All documents concerning actual or attempted payments and/or the transfer of
> monies to/from Glynfield, including but not limited to monies to/from the account
> at Rothschild Bank International Ltd[.] in the name of Glynfield as shown in swift

transaction reference no. 11005868570007P, including but not limited to monies
that [JPM] received and/or sent as an intermediary bank.

6. All documents concerning actual or attempted payments and/or the transfer of
monies to/from any of the African Businesses, including but not limited to monies
that [JPM] received and/or sent as an intermediary bank.

7. All statements for any accounts held by Morsgate, Monline UK, Gestcom
Trading, Transglobe, and/or Glynfield, whether held individually or jointly with
another individual or entity.

8. All statements for any accounts of any of the African Businesses, whether held
individually or jointly with another individual or entity.

9. Documents sufficient to show the identities of any individuals or entities with
control over accounts with [JPM] on behalf of Morsgate, Monline UK, and/or
Gestcom Trading.

10. Documents sufficient to show the identities of any individuals or entities who
instructed the payment of monies to, from, or through [JPM] on behalf of Morsgate,
Monline UK, and/or Gestcom Trading.

Subpoena at 11-12.  JPM apparently sent a series of rolling productions between February 8 and

February 14, 2024.  Dkt 10 at 1 n.1; *see also id.* at 1 (Moussy's counsel explaining in a February

28, 2024 letter to this Court: "Moussy does not expect any further productions at this time.").

Unaware that JPM had already produced these documents, Freddy appeared in the instant

action on February 26, 2024, requesting to be heard "before [JPM] is required to produce any

documents in response to the subpoena issued pursuant to the Application."  Dkt. 9 at 1.  In that

request, Freddy represented that "the English Court expressly rejected Applicant's requests for

broad discovery into the African Businesses" and, citing Moussy's failure to provide Freddy with

notice of his filing of the Section 1782 application, further argued that Moussy sought "not to

obtain legitimate discovery 'for use' in a foreign proceeding, but rather to pry into unrelated (and

previously settled) business affairs for other purposes."  *Id.*  at 1-2.  Moussy responded that, among

other retorts, JPM had already complied with the Subpoena.  Dkt. 10 at 1.  The Court ordered the

parties to meet and confer on the issues, Dkt. 12, and in a joint letter later submitted to the Court on March 15, 2024, Moussy reported that he had shared the entirety of JPM's production with Freddy and further expressed his willingness to return the documents to JPM, "subject to [Freddy] stipulating to certain facts set forth in those documents that corroborate admissions made by defendants in the English Proceedings." Dkt. 15 at 3. Freddy "request[ed] a motion conference with the Court to seek a protective order, sanctions, an order quashing the improperly issued subpoena, and all other appropriate relief." *Id.* at 2.

On April 16, 2024, the Court held a conference, at which Moussy "concede[d] for the Court that the failure to serve here was inadvertent." Dkt. 23 ("4/16/2024 Conference Tr.") at 8:24-9:1. Moussy urged, however, that there was "absolutely no prejudice" given that he had already shared with Freddy the "handful of documents produced" by JPM, *id.* at 9:3-6, and further proposed stipulating to refraining from (1) using the produced documents outside of the English Proceedings and (2) requesting any further documents from JPM, *id.* at 17:8-18. Freddy countered that "the documents were not discoverable in the first place because they never should have been produced," *id.* at 18:6-10, and requested leave to file a motion to that effect. The Court granted Freddy's unopposed request to intervene in the action, and set a briefing schedule for Freddy's anticipated motion. *Id.* at 19:1-20:13.

Freddy filed the instant motion to quash the subpoena and request for a protective order on April 23, 2024. Dkt. 19 ("Motion"). Moussy responded on May 2, 2024, Dkt. 25 ("Opposition"), and Freddy replied roughly two weeks thereafter, Dkt. 27 ("Reply").

### III.  Legal Standard

Section 1782 provides in pertinent part:

The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use

14

> in a proceeding in a foreign or international tribunal. . . .  The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. . . .  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a).  Pursuant to the statute, a district court is authorized to grant a Section 1782 request where: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person."  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).

If these statutory requirements are met, a court then assesses whether it should exercise its discretion to grant the requested assistance in light of the following factors set out by the Supreme Court in *Intel Corp. v. Advanced Micro Device*s: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or burdensome."  542 U.S. 241, 264-65 (2004).  In deciding whether to exercise its discretion to grant a Section 1782 application, a court considers the "twin aims" of the statute: "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts."  *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 244 (2d Cir. 2018) (quoting *In re*

*Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997)).  "In pursuit of these twin goals, the statute has, over the years, been given increasingly broad applicability."  *Brandi-Dohrn*, 673 F.3d at 80.

Courts may and routinely do resolve applications for discovery pursuant to Section 1782 through *ex parte* proceedings.  *See Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012).  These one-sided proceedings do not offend due process, given that the respondent—the party from whom the discovery is sought—may later move under Federal Rule of Civil Procedure 45(c)(3) to quash any such discovery request.  *Id.*  Parties against whom the requested information will be used may also challenge the court's power to issue the subpoena under the terms of the authorizing statute.  *In re Application of Sarrio, S.A.*, 119 F.3d 143, 148 (2d Cir. 1997).

### IV.  Discussion

As a preliminary matter, the Court agrees with Freddy that Moussy ran afoul of Federal Rule of Civil Procedure 45(a)(4) when he failed to serve notice and a copy of the Subpoena on Freddy before serving it on JPM.  *See* Fed. R. Civ. P.  45(a)(4) ("If the subpoena commands the production of documents . . . , then before it is served on the person to whom it is directed, a notice and a copy of the subpoena must be served on each party."); *see also In re Edelman*, 295 F.3d 171, 178-79 (2d Cir. 2002) (holding that protections of Rule 45 apply to persons subpoenaed under Section 1782); *In re Hornbeam Corp.*, No. 14 Misc. 424 (VSB), 2015 WL 13647606, at *5 (S.D.N.Y. Sept. 17, 2015) ("[U]nless the district court's authorizing order provides otherwise, a party engaged in foreign litigation who serves a § 1782 subpoena *duces tecum* to obtain documents for use in the foreign litigation must first serve notice on all parties to the foreign proceeding."), *aff'd*, 722 F. App'x 7 (2d Cir. 2018).  As this noncompliance deprived Freddy of his opportunity to move to quash the Subpoena before its February 22, 2024 compliance date, *see* Dkt. 10 at 1 (Moussy explaining that the Subpoena was served on January 25, 2024); Dkt. 8 (this Court

ordering JPM to respond to Subpoena within twenty-eight days of service), the Court considers Freddy's arguments in support of quashing the Subpoena without regard to the untimeliness of his motion. *See In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.)*, 581 F. Supp. 3d 509, 516 (S.D.N.Y. 2022) ("It is well settled that, to be timely, a motion to quash a subpoena must be made prior to the return date of the subpoena."); *Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 320 (S.D.N.Y. 2018) (explaining that district courts have broad discretion to consider untimely motions to quash (citations omitted)), *aff'd*, 349 F. Supp. 3d 346 (S.D.N.Y. 2018).

Accordingly, the Court first turns to Freddy's arguments that Moussy's application fails to meet the statutory requirements under Section 1782 and that the discretionary *Intel* factors on balance weigh against granting Moussy's application, before considering the appropriate remedy for Moussy's failure to provide Freddy with the requisite notice.

**A.    Whether the Application was Appropriately Granted**

In moving to quash the Subpoena, Freddy does not dispute that JPM resides in this District and that Moussy, as a party in the English Proceedings, is an "interested person." *See Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782 . . . ."); *see also* Tabaksblat Decl. ¶ 8 (asserting that JPM maintains multiple offices in Manhattan, New York); *id.*, Exh. 3 (Federal Deposit Insurance Corporation data showing JPM's Manhattan offices); 8/21/2023 Goldring Decl. ¶ 4 (explaining that Moussy took over the prosecution of the claims in the English Proceedings).

And as to the discretionary *Intel* factors, Freddy also does not dispute JPM's nonparticipation in the underlying English Proceedings—a circumstance that weighs in favor of granting Moussy's Section 1782 application. *See Intel*, 542 U.S. at 264 ("First, when the person from whom discovery is sought is a participant in the foreign proceeding . . . , the need for

17

# SPA-18

§ 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.").   Nor does Freddy meaningfully dispute the English Court's receptivity to Section 1782 discovery, as he refers to that second *Intel* factor only half-heartedly in a footnote, *see* Motion at 10 n.3.   *See Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015) ("[B]ecause the arguments appear only in footnotes, they are not properly raised, and the Court is under no obligation to consider them."); *cf. United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review.").

Rather, Freddy contends that the discovery sought is not "for use" in the English Proceedings, that Moussy seeks to circumvent the English Court's ruling on the scope of discovery, and that the Subpoena is unduly intrusive and burdensome.   At every turn, Freddy's arguments are predicated principally on the purported irrelevance of the discovery sought.

### 1.    Whether the Discovery Sought is "For Use" in the English Proceedings

The "for use" requirement of Section 1782 mandates that the discovery sought "be employed with some advantage or serve some use in the [foreign] proceeding."   *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015); *see also In re Atvos Agroindustrial Investimentos S.A.*, 481 F. Supp. 3d 166, 175 (S.D.N.Y. 2020) (explaining that the burden imposed on a Section 1782 applicant under the "for use" requirement is *de minimis*).   The term "for use" is afforded a "broad interpretation," and the "sought-after evidence need not be admissible or even discoverable under the rules of the foreign jurisdiction."   *Deposit Ins. Agency v. Leontiev*, No. 17 Misc. 414 (GBD) (SN), 2018 WL 3536083, at *3 (S.D.N.Y. July 23, 2018) (internal citations omitted); *see also In re O'Keeffe*, 650 F. App'x 83, 85 (2d Cir. 2016) ("[O]ur precedents expressly forbid district courts from considering the discoverability of evidence in a foreign proceeding when ruling on a § 1782 application"). Nevertheless, "an applicant who fails to demonstrate that the evidence is *minimally*

18

relevant to the foreign proceeding" will not meet the "for use" requirement. *In re BonSens.org*, 95 F.4th 75, 80 (2d Cir. 2024) (emphasis added); *see also Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 n.7 (2d Cir. 2015) ("The relevance of the information sought may be necessary, however, insofar as it is difficult to conceive how information that is plainly irrelevant to the foreign proceeding could be said to be 'for use' in that proceeding.").

Here, Moussy has sustained his burden under the statute's "for use" requirement. As earlier discussed, JPM serves as the U.S. intermediary bank for payments made by Morsgate to Transglobe and Glynfield. Moussy has requested documents concerning payments to and from Morsgate, Monline UK, Gestcom, Transglobe, Glynfield, and any of the seventy-nine companies encompassed by the term "African Businesses," as well as the individuals or entities that controlled or directed payments through Morsgate, Monline UK, and Gestcom. *See* Subpoena at 11-12. Broadly, this information concerns the African Businesses' profits, which are "transferred through the Morsgate-Tranglobe/Glynfield pipeline." Application at 4. And, according to Moussy, the profits earned by the African Businesses in turn inform the value of the Parker Services, as "the fees generated from the provision of Parker Services were calculated based on a percentage of the expenditures incurred to provide those services and support the African Businesses' operations." 5/1/2024 Goldring Decl. ¶ 6; Tabaksblat Decl. ¶ 7; Application at 3-4; *cf.* Morsgate-Parker Agreement § 33 ("The Services Fee is the annual sum Morsgate will pay to Parker, in addition to reimbursing Parker for the *costs of providing the Services* as provided in the agreement." (emphasis added)).[6] Given that the UK Transfer included the transfer of the right to provide the Parker

---

[6] Freddy contests the notion that the fees generated from the provision of the Parker Services are informed by the African Businesses' profits. *See* Motion at 8 (describing Moussy's position as "groundless"). On the one hand, Freddy's English counsel urges that "the value of the 'Parker Services' was not determined on the basis of revenue generated from or expenditure

Services from Monline International to Monline UK, discovery on the value of the provision of those services would plainly "serve some use" in the English Proceedings, where the question of whether adequate consideration was paid for the UK Transfer is a key issue and Moussy's damages request is based on the lost business opportunity resulting from the UK Transfer.

      On that score, Moussy represents that he intends to use the discovery in part to refute Freddy's position in the English Proceedings that the UK Transfer did *not* constitute the transfer of a "valuable business." *See* 5/1/2024 Goldring Decl. ¶ 6 ("[F]inancial records evidencing significant trading activity by the African Businesses, supported by the Parker Services, would directly refute [Freddy's] defence."). He further explains that the existence or absence of transfers after July 2021 from Morsgate (and potentially Gestcom) to Monline UK or other unknown parties would help determine whether the Parker Services are being provided to this day and, if so, by which entity. Application at 4; *see also* 5/1/2024 Goldring Decl. ¶ 6 ("[G]iven that Moussy does not know which entity currently provides Parker Services, he has been unable to obtain discovery directly showing the costs incurred by that unknown entity in the provision of Parker Services."). Lastly, he maintains that the discovery sought will "provide critical information to calculate the

---

incurred by the African Businesses." Michaelson Decl. ¶ 21. And on the other hand, Moussy's English counsel declares that "financial records evidencing significant trading activity by the African Businesses, supported by the Parker Services, would directly refute [Freddy's] defence" concerning the value of the provision of the Parker Services. 5/1/2024 Goldring Decl. ¶ 6. The Court declines to referee this battle-by-affidavit and is satisfied by Moussy's representations—which appear consistent with the English Court's pronouncements, *see, e.g.,* 7/19/2023 English Ct. Hr'g Tr. at 23 (the English Court agreeing that "an analysis would need to be made about what Parker services were being supplied and to whom" in order to assess the "size and scope of the business opportunity" allegedly transferred away from Monline International)—for purposes of the instant matter. *Cf. In re Tiberius Grp. AG*, No. 19 Misc. 467 (VSB), 2020 WL 1140784 at *7 (S.D.N.Y. Mar. 6, 2020) ("[B]ecause the substantive issues presented in the foreign litigation are to be decided by a foreign court applying unfamiliar foreign law, the district court should be permissive when assessing relevance." (internal quotation marks omitted)).

equitable compensation and/or damages for the assets transferred out of Monline International."
Application at 4. In light of these representations, this Court is satisfied that the discovery sought
is "for use" in the English Proceedings.

In the face of this showing, Freddy's contentions that the requested information is plainly
irrelevant to the issues in the English Proceedings are unpersuasive.

First and principally, Freddy maintains that the irrelevance of the subpoena requests for
financial records concerning the African Businesses (Subpoena Requests 6 and 8) is evidenced by
the English Court's pronouncement that "the broad issues of the African [B]usiness[es] [are not]
a key issue in [the English Proceedings]," which it made in connection with its rejection of
Proposed Issue 9 (captioned "The African Business") at the July 19, 2023 hearing. Motion at 6;
*see* 7/19/2023 English Ct. Hr'g Tr. at 40; *see also* Michaelson Decl. ¶ 6. The Court disagrees.

To start, Moussy does not seek through his Section 1782 application the category of
documents described in Proposed Issue 9. As discussed at *supra* I.B, the putative requests included
under Proposed Issue 9 related to "the composition of the African Business from 2013 onwards,"
and encompassed documents concerning the role that each of Morsgate, Parker Logistics, Moussy,
Freddy, Levy, Aghai, and Monline UK played in the African Businesses, as well as the role that
each of Moussy and the English Defendants played in Morsgate, Parker, and Monline UK.
7/19/2023 English Ct. Hr'g Tr. at 31; *see* Proposed Issues at 7-8. These documents were sought
"for the independent purpose of establishing the relationship of Defendants Levy and Aghai to the
African Businesses, which, in turn, would help Moussy support his allegation that they are
nominees for Freddy Salem." 5/1/2024 Goldring Decl. ¶ 15. Save for their references to the
"African Business," the disclosure requests under Proposed Issue 9 bear no resemblance to the
requests in the challenged Subpoena, which target financial records reflecting the trading activity

of the African Businesses—not documents reflecting the composition of the African Businesses. Indeed, it would seem doubtful that JPM even possesses documents in the latter category. *See* Opposition at 9.

Freddy appears to interpret the English Court's determination that "the broad issues of the African [B]usiness[es] [are not] a key issue in [the English Proceedings]" as a categorical bar to *any* discovery related to African Businesses. But the English Court made that determination solely in the context of considering Proposed Issue 9—which, once again, concerned Moussy's requests for information on the composition and general operations of the African Businesses. *See* 7/19/2023 English Ct. Hr'g Tr. at 40-41. Far from announcing a blanket prohibition on all discovery related to the African Businesses, the English Court appeared to recognize the relevance of discovery related to the African Businesses' trading activity. For instance, the English Court acknowledged Moussy's need to assess the "benefits that [the English Defendants] have received from the supply of Parker services under the 2016 agreement or otherwise to other companies *within the African business* or from other activities of [Monline UK]" in approving Proposed Issues 8(g) (concerning whether Monline UK supplied the Parker Services or other services to persons other than Morsgate and, if so, under what terms and in what circumstances Monline UK supplied such services) and 8(h) (concerning what payment Monline UK has received since June 7, 2016 from entities other than Morsgate). *Id.* at 25-26 (emphasis added). And the English Court further agreed that "the extent of the business opportunity" lost through the UK Transfer was "relevant" to "quantum" and would require information "about what Parker services were being supplied and to whom." *Id.* at 23. The suggestion that the English Court—in rejecting the specific set of requests under Proposed Issue 9—deemed irrelevant *all* disclosure concerning the African Businesses is, at best, misguided.

Moreover, even setting aside the inapplicability of the English Court's remarks as to Proposed Issue 9, the Court is not convinced that a foreign tribunal's adverse discovery rulings normally should be afforded dispositive or otherwise significant weight in the assessment of whether a Section 1782 applicant has sustained his burden under the "for use" requirement. Such consideration would seem to be in tension with the statute's absence of a "foreign discoverability" requirement. While the Court recognizes that a sweeping and unambiguous pronouncement by the English Court that the specific discovery sought here is wholly irrelevant to the English Proceedings would certainly betray any representation that the requested discovery is "for use" in those proceedings, no such pronouncement was made. Accordingly, the Court discerns no basis from the English Court's rulings on the parties' proposed issues of disclosure to find that Moussy has failed to meet the "for use" requirement here.

Freddy's arguments challenging Moussy's remaining discovery requests also fail. He urges that Moussy's failure to request discovery concerning Transglobe and Glynfield in the English Proceedings demonstrates the broad irrelevance of these entities. Motion. at 7; *see* Michaelson Decl. ¶ 16. But, of course, there is no exhaustion requirement under Section 1782. *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1098 (2d Cir. 1995) ("Relying on the plain language of the statute, this Court has also refused to engraft a 'quasi-exhaustion requirement' onto section 1782 that would force litigants to seek 'information through the foreign or international tribunal' before requesting discovery from the district court." (quoting *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992))). Freddy also argues that those requests concerning Gestcom, Monline UK, and Morsgate (Requests 3, 7, 9, and 10) exceed the scope of discovery already granted in the English Proceedings. Motion at 7. That simply is not a basis to find that the discovery in a Section 1782 application is not "for use" in the foreign proceedings.

## SPA-24

The Court thus finds that the statutory requirements under Section 1782 have been met and so turns to the remaining discretionary factors raised in Freddy's motion to quash.

> **2.      Whether the Request is an Attempt to Circumvent Foreign Proof-Gathering Restrictions**

Freddy accuses Moussy of attempting to circumvent the English Court's rulings and procedures, once again relying on his misconstruction of the English Court's discovery determinations. This argument fares no better under this banner.

The third *Intel* factor seeks to curtail "attempt[s] to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. At the same time, however, Section 1782 does not limit a district court's authority to require the production of documents "to materials that could be discovered in the foreign jurisdiction if the materials were located there." *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d 243, 251 (S.D.N.Y. 2018) (quoting *Intel*, 542 U.S. at 260). In fact, the Second Circuit has expressly instructed that a court should not deny "discovery pursuant to § 1782 solely because such discovery is unavailable in the foreign court." *In re Metallgesellschaft*, 121 F.3d at 79. At first blush, this instruction might seem difficult to reconcile with the instruction under the third *Intel* factor that the court consider whether the Section 1782 request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country." *See Mees*, 793 F.3d at 303 n.20. But the fact "[t]hat a country does not enable broad discovery within a litigation does not mean that it has a policy that restricts parties from obtaining evidence through other lawful means." *Id.* Rather, "[p]roof-gathering restrictions are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information." *Id.* (internal quotation marks omitted). "[T]o demonstrate circumvention,

[the party opposing the application] must illustrate . . . that [the applicant is] engaged in a bad faith endeavor to misuse Section 1782." *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d at 251.

Because the English Court did not expressly reject the very discovery sought in the instant matter, Freddy's argument fails at the outset. *Cf. In re Chevron Corp.*, 633 F.3d 153, 163 (3d Cir. 2011) ("Without a definitive determination that the [foreign court] has denied [the applicant] access to the same documents that [the applicant] seeks in its section 1782 discovery application, an issue on which appellants bear the burden of proof as the parties opposing discovery, it cannot be said that [the] section 1782 application is 'an attempt to circumvent foreign proof-gathering restrictions.'"). Even if it had, it is far from clear that such a rejection—especially in the absence of any showing of bad faith, *see infra*—would necessarily evince circumvention. *See id.* (explaining that "regardless of [the foreign court]'s rulings on [the applicant]'s request for documents, it would be a stretch to conclude that the section 1782 proceeding was an attempt to circumvent [foreign] restrictions that somehow was offensive to the [foreign court]" where the foreign court "might be receptive to section 1782 evidence").

Freddy plucks language from three cases in this District to support his general proposition that Section 1782 requests are routinely denied where the applicant has already sought and has been denied the same discovery from the foreign tribunal. *See* Motion at 8-9. But in two of these cases, the court did not even find that the applicant's Section 1782 request concealed an attempt to circumvent the foreign tribunal's rules. *See In re Tel. Media Grp. Ltd.*, No. 23 Misc. 215 (JGLC), 2023 WL 5770115, at *8-9 (S.D.N.Y. Sept. 6, 2023) (holding that the circumvention factor *favored* granting the application where the respondent "presented no indication that any [] rule or policy exists" in the United Kingdom that "bar[s]" the use of the at-issue evidence to

support defenses to defamation or that "Section 1782 assistance would be rejected or otherwise forbidden"); *In re Top Matrix Holdings, Ltd.*, No. 18 Misc. 465 (ER), 2020 WL 248716, at *6 (S.D.N.Y. Jan. 16, 2020) (holding that the circumvention factor *favored* granting the application where the respondent was "unable to point to any specific Swiss [confidentiality] policy that [the applicant]'s request would circumvent," and the Swiss court had not issued any negative discovery ruling barring use of the requested discovery). And in the third case, the applicant had not sought (and thus had not been denied) the discovery from the foreign tribunal. *See In re Kreke Immobilien KG*, No. 13 Misc. 110 (NRB), 2013 WL 5966916, at *6 (S.D.N.Y. Nov. 8, 2013), *abrogated by In re del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019).

Regardless, Freddy has failed to illustrate that Moussy is engaging in a bad faith endeavor to misuse Section 1782. In an effort to impugn Moussy's motivations in applying for discovery assistance here, Freddy suggests that Moussy intends to use the discovery outside of the English Proceedings. *See* Dkt. 9 at 2 ("Applicant's course of conduct suggests that his goal is not to obtain legitimate discovery 'for use' in a foreign proceeding, but rather to pry into unrelated (and previously settled) business affairs for other purposes."); Reply at 7-8. But Moussy has denied such intent, and even has offered to enter into a stipulation precluding use of the materials outside of the English Proceedings. *See* 4/16/2024 Conference Tr. at 17:8-18. The Court has no reason to discredit this representation. In any event, "ancillary benefits that may accrue to a Section 1782 petitioner do not weigh against a meritorious application." *In re Tel. Media Grp. Ltd.*, 2023 WL 5770115, at *11 (finding no bad faith circumvention where the intervenor alleged that the Section 1782 discovery might be used for other purposes); *In re Al-Attabi*, No. 21 Misc. 207 (VSB) (RWL), 2022 WL 229784, at *9 (S.D.N.Y. Jan. 26, 2022) ("[P]rovided the statutory and discretionary criteria are satisfied, as they are here, a Section 1782 application should not be denied merely

because the discovery material may have potential other uses by the petitioner."); *cf. In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 135 (2d Cir. 2017) (holding that "Section 1782 does not prevent an applicant who lawfully has obtained discovery under the statute with respect to one foreign proceeding from using the discovery elsewhere unless the district court orders otherwise").

Next, Freddy's charge that Moussy has misrepresented the English Court's discovery order rings hollow. As discussed at length *supra*, this Court discerns no express pronouncement from the English Court prohibiting the discovery sought in the instant action.[7]

Finally, Freddy takes issue with the lack of explanation for Moussy's noncompliance with Rule 45. Moussy's counsel already conceded the failure to provide the requisite notice, in violation of Rule 45, and expressed that the failure was "inadvertent." 4/16/2024 Conference Tr. at 8:24-9:1. The lack of further explanation does not demonstrate bad faith, especially considering that Moussy seems to have made every effort to minimize the prejudice arising from his noncompliance with Rule 45. For instance, Moussy shared the entirety of JPM's productions with Freddy shortly after Moussy's Rule 45 noncompliance was brought to light. *See* Dkt. 15 at 3. Additionally, Moussy reportedly engaged in good faith efforts to come to an agreement with Freddy whereby

---

[7] On a related note, Freddy makes much of "international comity" in urging denial of Moussy's application, suggesting that this Court's granting of Moussy's Section 1782 application may offend the English Court. Motion at 9-10. Freddy's concern is misplaced. Once again, the English Court did not deny the discovery sought here. Even if it had, such comity concerns still "do not permit our insertion of a generally applicable foreign-discoverability rule into the text of § 1782(a)." *Intel*, 542 U.S. at 261. Significantly, Freddy has offered no authoritative proof that the English Court would reject the discovery requested here. *Cf. In re App. of Auto-Guadeloupe Inv. S.A.*, No. 12 Misc. 221 (RPP), 2012 WL 4841945, at *6 (S.D.N.Y. Oct. 10, 2012) ("Second Circuit case law places the burden on the party opposing discovery to show that a foreign court would not be receptive to this assistance."). And interestingly, when Freddy's English counsel raised the issue of Moussy seeking discovery on the African Businesses through his Section 1782 application pending before in the Southern District of Florida, *see In re Moussy Salem*, No. 23 Civ. 23186 (KMM) (S.D. Fla.), the English Court expressed no disapproval as to Moussy's making such request and insisted that Freddy's English counsel allow the United States court to resolve any issues arising in that Section 1782 action. *See* 7/19/2023 English Ct. Hr'g Tr. at 37-38.

Moussy would distill the information from the document production to stipulations corroborating admissions made by the defendants in the English Proceedings and would destroy the documents thereafter. *Id.* at 2-4. And lastly, Moussy represented to this Court that he does not intend to use the discovery sought outside of the English Proceeding and proposed a stipulation to that effect (as well as a stipulation barring Moussy from serving JPM with any further document requests). 4/16/2024 Conference Tr. at 17:8-18.

In these circumstances, the Court finds no basis to infer that Moussy made his Section 1782 application to circumvent proof-gathering restrictions in the English Court. Accordingly, the Court finds that the third *Intel* factor weighs in favor of Moussy.

### 3.        Whether the Request is Unduly Intrusive or Burdensome

Finally, Freddy urges that fourth *Intel* factor also weighs against granting the Section 1782 application. Under the fourth *Intel* factor, "a district court evaluating a [Section] 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure," *Mees*, 793 F.3d at 302, which includes consideration of the probative value of the materials sought, *In re Okean B.V. & Logistic Solution Int'l*, 60 F. Supp. 3d 419, 432 (S.D.N.Y. 2014) (denying a Section 1782 application where production of the materials would be intrusive and burdensome and the "probative value . . . [was] conjectural at best"). The determination of whether a subpoena creates an undue burden further "depends upon such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 49 (S.D.N.Y. 1996) (internal quotation marks omitted). Of course, as Freddy is not being asked to produce anything, he cannot advance arguments as to the

burden the Subpoena imposes. *In re Tel. Media Grp. Ltd.*, 2023 WL 5770115, at *11. Nevertheless, Freddy has "standing to object to the subpoena as overbroad." *Id.*

In so objecting to the Subpoena's breadth, Freddy merely asserts that "nearly all" the financial records included in the document request "are irrelevant to the English Case" and that those financial records that are concededly relevant "are excessive." Motion at 10. As support for these broad averments, Freddy relies exclusively on his interpretation of the English Court's relevancy determinations. *Id.* Setting aside that "whether a request is intrusive or burdensome should not be assessed based on the 'discovery scope' available in the foreign proceedings," *Mees*, 793 F.3d at 302, the Court has already rejected Freddy's interpretation of the English Court's discovery rulings. Accordingly, the Court finds that this factor also weighs in Moussy's favor.

\* \* \*

Having considered Moussy's Section 1782 application with fresh eyes and in conjunction with Freddy's arguments, the Court finds once again that the application meets all the statutory requirements and that every discretionary *Intel* factor weighs in favor of granting it. The Court thus finds no basis on the merits of the application to quash the Subpoena and turns next to consider the appropriate remedy for Moussy's noncompliance with Federal Rule of Civil Procedure 45.

**B.     Appropriate Remedy for Noncompliance with Federal Rule of Civil Procedure 45**

As earlier discussed, Moussy failed to comply with his obligations under Rule 45 to provide notice to the English Defendants before serving his Section 1782 subpoena *duces tecum* on JPM. While this Court certainly has the discretion to quash the Subpoena in light of Moussy's noncompliance, there is no requirement that it do so. *In re Hornbeam*, 2015 WL 13647606, at *8. Moreover, "courts often require the party seeking such relief to show that it was prejudiced by the lack of notice before quashing a subpoena for failure to provide notice." *Id.* (collecting cases).

Here, as a result of Moussy's noncompliance, Freddy was undoubtedly deprived of his opportunity to challenge the appropriateness of Moussy's *ex parte* application and representations therein.  The Court thus granted Freddy leave to intervene and has fully heard Freddy on his arguments attacking Moussy's Section 1782 application.  Moreover, Moussy has already shared JPM's production with Freddy.  Freddy also argues that he has been prejudiced because Moussy's failure to comply with Rule 45 "deprived Freddy of the benefit of the English Court's ruling in his favor," Motion at 12, but again, this Court does not interpret the English Court's rulings as rejecting the discovery sought in the Subpoena.  Given that Freddy has articulated no further prejudice arising from Moussy's noncompliance, the Court finds that the drastic measure of quashing the Subpoena is unwarranted here.  Instead, the Court finds that the appropriate remedy is to bind Moussy to the terms he proposed at the April 16, 2024 conference.

Accordingly, within two weeks of this Opinion and Order, the parties shall propose language, preferably in a joint proposal, for a protective order that prohibits Moussy (1) from seeking additional documents from JPM under the instant Subpoena and (2) from using the documents produced by JPM in response to the Subpoena in any other proceedings.

### V.  Conclusion

For the foregoing reasons, the Court denies Intervenor Freddy Salem's motion to quash. The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 19.

SO ORDERED.

Dated: June 17, 2024
       New York, New York

_____
JOHN P. CRONAN
United States District Judge

30